IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

COMMISSIONER OF THE DEPARTMENT    :      CIVIL ACTION
OF PLANNING AND NATURAL        :
RESOURCES, ROBERT S. MATHES    :
                                    :
         v.                 :
                                    :
CENTURY ALUMINA COMPANY, LLC,    :
et al.                               :      NO. 05-0062

MEMORANDUM

Bartle, C.J.                                            July 13, 2010

       Plaintiffs, Commissioner of the U.S. Virgin Islands
Department of Planning and Natural Resources ("DPNR"), Robert S.
Mathes, in his capacity as Trustee of Natural Resources of the
Territory of the United States Virgin Islands (the "Trustee"),
and the Government of the Virgin Islands have filed this multi-
count environmental lawsuit against defendants Century Alumina
Company, LLC ("Century"), Virgin Islands Alumina Company
("Vialco"), St. Croix Alumina, LLC ("SCA"), Lockheed Martin
Corporation ("Lockheed"), Alcoa World Alumina, LLC ("Alcoa"),
Hovensa, LLC ("Hovensa"), Hess Oil Virgin Islands Corporation
("HOVIC"), and St. Croix Renaissance Group, LLP ("SCRG"). Now
before the court are the motions of all defendants for summary
judgment with respect to Count 6 of Plaintiffs' First Amended
Complaint seeking damages under the Comprehensive Environmental
Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C.

§ 9601 et seq.  Defendants contend that this claim is barred by the statute of limitations.

Plaintiffs allege that the defendants have damaged the natural resources of St. Croix by releasing hazardous substances into industrial tracts owned at various times by defendants as well as into the groundwater and Caribbean Sea.  In addition to the CERCLA claim, the First Amended Complaint contains counts for damages under strict liability for abnormally dangerous activity (Count 1), negligence (Count 2), negligence per se (Count 3), public nuisance (Count 4), and the Virgin Islands Oil Spill Prevention and Pollution Control Act, 12 V.I.C. § 703 (Count 5).

CERCLA was enacted by Congress in 1980 in response to concerns about hazardous chemical releases threatening the health and beauty of the nation's natural resources and posing great risks to the public.  See Exxon Corp. v. Hunt, 475 U.S. 355 (1986).  The statute contains many different provisions, including several which allow states and territories to bring civil actions to recoup damages caused by such hazardous substance releases.  Claims under § 107(a) allow a state's trustee to bring a claim for damages to the natural resources of the state.  See 42 U.S.C. § 9613(g)(1).[1]  Such natural resource are defined as:  "land, fish, wildlife, biota, air, water, ground

---

1.  State trustees can also bring claims to recover the costs sustained in cleaning up any such hazardous releases.  See 42 U.S.C. § 9601(g)(2).  The Trustee has brought such a claim against these defendants in a companion case before this court. See Dep't of Planning and Natural Res. v. St. Croix Renaissance Group LLC, et al., D.V.I. Civ.A. No. 07-114.

water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States ... any State or local government, any foreign government, [or] any Indian tribe..." 42 U.S.C. § 9601(16). The term "state" includes territories of the United States such as the U.S. Virgin Islands. See 42 U.S.C. § 9601(27).

As set forth in the First Amended Complaint and undisputed by defendants, the industrial tracts in question are known as the South Shore Industrial Area. They are located within the central plain on the south shore of St. Croix. The tracts abut the Caribbean Sea on their southern boundary, Route 68 on their northern boundary, and Route 62 on their eastern boundary. The Area contains an oil refinery, which occupies the eastern tract, and a now closed alumina refinery, located on the western tract. Beneath the Area is the Kingshill Aquifer. The Fairplains and Bethlehem Well Fields, which draw groundwater from the Kingshill Aquifer, are directly adjacent to the alumina refinery on its western border. The Barren Spot Well Field is adjacent to the oil refinery on its northern border.

Plaintiffs filed their original Complaint on May 5, 2005. Both the Trustee and the Government of the Virgin Islands are plaintiffs in this lawsuit. The Trustee holds the statutory authority to bring natural resource damages claims under CERCLA. See 42 U.S.C. § 1907(f)(2)(B). The Government of the Virgin

Islands has the authority to bring the other claims in the First Amended Complaint, which are not at issue in these motions.

Defendant HOVIC, a corporation organized under the laws of the U.S. Virgin Islands, owned and operated the oil refinery from 1967 until 1998.  In 1998, defendant Hovensa assumed ownership and operation of the oil refinery.  Hovensa, a limited liability company organized under the laws of the U.S. Virgin Islands, continues to own and operate the oil refinery.  HOVIC owns fifty percent of Hovensa.  The other fifty percent is owned by PDVSA V.I., Inc., a wholly-owned subsidiary of Petroleos de Venezuela S.A.

The alumina refinery was built in 1965 by Harvey Aluminum Virgin Islands, Inc., a wholly-owned subsidiary of Harvey Aluminum Incorporated.  In 1972, after Martin Marietta Corporation gained a controlling share in Harvey Alumina Incorporated, Harvey Aluminum Virgin Islands was renamed Martin Marietta Aluminum, Inc.  Martin Marietta has since merged into defendant Lockheed.

In May 1989, defendant Vialco purchased the alumina refinery from Martin Marietta Aluminum, Inc.  In April 1995, Vialco was acquired by defendant Century.  In July 1995, defendant SCA purchased the alumina refinery from Century.  SCA, a limited liability corporation organized under the laws of Delaware, owned and operated the refinery from July 1995 until its eventual shut-down in 2002.  Defendant Alcoa is the parent corporation of SCA.

In June 2002, SCA sold the alumina refinery to defendant SCRG, which is a limited liability partnership, organized under the laws of the State of Delaware.  The partners are Brownfield Recovery Corporation and Energy Answers Corporation.  SCRG is the current owner of the alumina refinery, although it has never operated it as such.

I.

Defendants, as noted above, move for summary judgment on Count 6 under CERCLA on the ground that the claims are barred by the statute of limitations.  Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).  After reviewing the evidence, the court makes all reasonable inferences from the evidence in the light most favorable to the non-movant.  In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).

Section 113(g)(1) of CERCLA provides:

Actions for natural resource damages....  no
action may be commenced for damages ... unless
that action is commenced within 3 years after the
later of the following:
        (A) The date of the discovery of the loss and
        its connection with the release in question.

>           (B) The date on which regulations are
>           promulgated under section 301(c) [42
>           U.S.C. § 9651(c)].

42 U.S.C. § 9613(g)(1). The limitations provision under

subsection g(1)(B) is not relevant here as the regulations have

long since been promulgated. See California v. Montrose Chem.

Corp., 104 F.3d 1507 (9th Cir. 1997). We focus instead on

subsection g(1)(A). As plaintiffs' original Complaint was filed

on May 5, 2005, the CERCLA claims will be out of time only if

defendants can establish that the Trustee "discovered" the losses

to the natural resources of the Virgin Islands and their

"connection with the releases in question" on or before May 5,

2002. Defendants of course must show that there is no genuine

issue as to any material facts in order to prevail since the

matter is before the court on a motion for summary judgment.

        Defendants argue that they only need to show that the

Trustee had constructive knowledge of the losses and their

connection to the releases in order to satisfy CERCLA's

"discovery" and "connection" requirements. In other words,

defendants assert that the Trustee does not have to have actual

knowledge of the these facts in order to start the running of the

statute of limitations. According to defendants, the clock

begins to tick when the Trustee reasonably should have known.

        Plaintiff Trustee, on the other hand, maintains that

the test is one of actual knowledge. He argues that

§ 113(g)(1)(A) uses the language "the date of the discovery" and

that those words embody an actual knowledge standard. He also

asserts that Congress knows how to use the should-have-known standard when it wants to do so. Indeed, § 113(g)(1)(A), the section in issue, contrasts with the section of CERLCA requiring that actions for damages under state law accrue on the "federally required commencement date." There, Congress provided that this date is "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) [of this section of CERCLA] were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4).

In ascertaining the meaning of a statute, the court must "first look at the statute's language and the plain meaning of that language." Ries v. AMTRAK, 960 F.2d 1156, 1161 (3d Cir. 1992). Section 113(g)(1)(A) does not state expressly whether the Trustee's discovery means actual knowledge or whether discovery means the point in time when the Trustee reasonably should have known based on the information available to him. Courts have widely acknowledged that CERCLA is a poorly drafted statute with numerous ambiguities and internal contradictions. See United States v. Alcan Aluminum Corp., 964 F.2d 252, 258 (3d Cir. 1992); Artesian Water Co. v. Gov't of New Castle County, 851 F.2d 643, 648 (3d Cir. 1988). Even the Supreme Court of the United States has observed that CERCLA is "not a model of legislative draftsmanship." Exxon Corp. v. Hunt, 475 U.S. 355, 363 (1986).

The parties have cited to us no case which has decided the meaning of the CERCLA statute of limitations in issue here,

and we have found none.[2]  Nonetheless, numerous federal courts

have provided guidance as to the best methods for interpreting

CERCLA more generally.  In <u>United States v. USC Corp.</u>, the Court

of Appeals for the Third Circuit ruled that an ambiguous section

of CERCLA should be interpreted as following common law standards

unless specific language in the statute explicitly rejected it.

<u>See</u> 68 F.3d 811, 824 (3d Cir. 1995).  The Court of Appeals based

its analysis on the Supreme Court's reasoning that "if Congress

intends for legislation to change the interpretation of a

judicially created concept, it makes that intent specific."

<u>Midatlantic Nat'l Bank v. New Jersey Dep't of Environmental</u>

<u>Protection</u>, 474 U.S. 494, 501 (1986).

     Courts have applied the common law knew-or-should-have-

known discovery rule to federal statutes of limitations in

contexts other than CERCLA.  <u>See</u> <u>Merck & Co. v. Reynolds</u>, 130 S.

Ct. 1784, 1787 (2010); <u>see</u> <u>also</u> 2 Corman § 11.1.1, at 134; 37 Am.

Jur. 2d, Fraud and Deceit § 347, p. 354 (2001 and Supp. 2009).

In <u>Merck & Co. v. Reynolds</u>, the United States Supreme Court

_____

2.  The parties have cited two cases where federal courts
considered but did not decide this issue.  <u>See</u> <u>Kelley v. United</u>
<u>States</u>, 23 ERC (BNA) 1503 (W.D. Mich. 1985); <u>United States v.</u>
<u>Montrose Chem. Corp. of California</u>, 104 F.3d 1507 (9th Cir.
1997).  In <u>Kelley</u>, the court found that under either an actual or
constructive knowledge standard, the plaintiff could not have
discovered the loss until two years prior to filing suit, when a
critical scientific survey had been published.  <u>See</u> 23 ERC at *2.
In <u>Montrose</u>, the court found that the agency headed by the
plaintiff trustee (referred to by the court as the "trustee
agency") had received actual knowledge and thus did not need to
decide whether constructive knowledge would have been sufficient.
<u>See</u> 104 F.3d at 1514.

recently decided that the federal statute of limitations for private rights of action involving securities fraud claims embodies a constructive knowledge standard.  130 S. Ct. at 1787. The federal statute in question provides that:

> [A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of--
> (1) 2 years after the discovery of the facts constituting the violation; or
> (2) 5 years after such violation.

28 U.S.C. § 1658(b).  Despite the fact that the statute is completely silent as to whether "the discovery" in (b)(1) must be actual or constructive, the Supreme Court concluded that "Congress intended courts to interpret the word 'discovery' in accordance with common law discovery rule principles," that is, that a should-have-known standard is applicable.  Merck, 130 S. Ct. at 1788.  The Supreme Court reasoned that "[the] word "discovery" refers not only to a plaintiff's actual discovery of certain facts, but also to the facts that a reasonably diligent plaintiff would have discovered."  Id. at 1793.

The Court of Appeals for the Third Circuit has also read a constructive knowledge discovery standard into an otherwise silent federal statute of limitations for claims under Title VII of the Civil Rights Act of 1964.  Title VII provides that "[a] charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment

-9-

practice occurred..." 42 U.S.C. § 2000e-5(e)(1). In interpreting this language, the Court of Appeals held that "[a] claim accrues in a federal cause of action as soon as a potential claimant either is aware, _or should be aware_, of the existence of and source of an injury." Oshiver v. Levin, 38 F.3d 1380, 1386 (3d Cir. 1994) (emphasis added); see also Keystone Ins. Co. v. Houghton, 863 F.2d 1125, 1127 (3d Cir. 1988). The court noted that to require actual knowledge to trigger the claim's accrual would "require an insufficient degree of diligence on the part of the potential claimant. ... Thus, the 'polestar' of the discovery rule is not the plaintiff's actual knowledge of injury, but rather whether the knowledge was known, or through the exercise of reasonable diligence, knowable to the plaintiff." Oshiver, 38 F.3d at 1386.

Furthermore, regulations promulgated by the Department of the Interior ("DOI") under CERCLA provide further illumination as to the proper interpretation of the statute of limitations in issue. In 1986, the DOI issued final rules on natural resource damages assessments under § 112 of CERCLA. See 42 U.S.C. § 9612(d). These regulations cover claims brought for damages to natural resources against the government-created Superfund. The statute of limitations contained in § 112 provides:

> No claim may be presented under this section
> for recovery of the damages referred to in
> section 107(a) [42 U.S.C. § 9607(a)] unless
> the claim is presented within 3 years after
> the later of the following:
>     (A) The date of the discovery of the loss and
>     its connection with the release in question.

> (B) The date on which final regulations are
> promulgated under section 301(c).

42 U.S.C. § 9612(d)(2).  This language is nearly identical to the

language in § 113(g)(1)(A) at issue here.

The final rule promulgated by the Department of the

Interior for § 112(d)(2) states that "discovery occurs when the

authorized official knows **or should have known** of the injury and

its relationship to the discharge or release for which recovery

is sought."  43 C.F.R. part 11, 51 Fed. Reg. 27,674, 27,698

(Aug. 1, 1986) (emphasis added).[3]  Found in the preamble to the

rule, this statement is the agency's response to a public comment

suggesting that the statute of limitations be tolled until final

rules were promulgated.  The rationale of the DOI regulation was

to limit stale claims.  The agency's response further declined to

toll the statute of limitations until the trustee had completed

the statutory Injury Determination phase.[4]  It noted that in

doing so "the authorized official could preserve its cause of

action indefinitely by unduly delaying that portion of the

_____

3.  The Trustee appears to argue that the regulations promulgated
by the Department of the Interior have been invalidated by Ohio
v. U.S. Department of the Interior.  880 F.2d 432 (D.C. Cir.
1989).  While Ohio did invalidate the DOI's rule for calculating
the correct measure of damages in natural resource damages cases,
it did not address the regulations in their entirety.  Thus, the
holding in Ohio has no bearing on our decision here today.

4.  Pursuant to CERCLA, the DOI promulgated regulations for
trustees engaging in statutorily-mandated natural resource
damages assessments.  See 43 C.F.R. 11, 51 Fed. Reg. 27,674
(Aug. 1, 1986); see also 42 U.S.C. § 9651.  The Injury
Determination phase is one part of those assessments.

assessment process."  Id.  This rationale applies with equal force to the construction of § 113(g)(1)(A).

Finally, the application of a constructive knowledge standard to the statute of limitations found in § 113(g)(1)(A) best achieves the broad remedial purposes of CERCLA.  The Supreme Court has declared that "the overall purpose of a statute is a useful referent when trying to decipher ambiguous statutory language."  See Exxon Corp. v. Hunt, 475 U.S. 355, 371 (1986).  One of the purposes of CERCLA is speedy and complete remediation of areas polluted by hazardous substances.  See E.I. DuPont de Nemours & Co. v. U.S., 508 F.3d 126, 135 (3d Cir. 2007); Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 676 (3d Cir. 1986).  If the court were to impose an actual knowledge standard for the triggering of the statute of limitations, trustees would be able to delay proceedings and clean-up by engaging in willful blindness.  Holding plaintiffs to a constructive knowledge standard furthers the goal of speedy remediation by prompting state and territorial trustees to take seriously releases detrimental to the environment and move swiftly in addressing them.

The current Trustee, the plaintiff here, does not contend that he cannot be held accountable for the knowledge of the previous Trustees.  Nonetheless, he asserts that the court should not attribute to him as the Trustee any knowledge of the U.S. Virgin Islands Department of Planning and Natural Resources ("DPNR"), the agency which he heads as Commissioner.  DPNR is the

Virgin Islands agency responsible for overseeing and enforcing the environmental laws of the Virgin Islands.  CERCLA requires the governor of each state (or territory) to appoint a Trustee to protect and manage the natural resources of that state.  See 42 U.S.C. § 9607(f)(2)(B).  According to the First Amended Complaint, Robert S. Mathes was designated Trustee over the Virgin Islands' natural resources on April 16, 2007.  He maintains that any knowledge imputed to him must be based on evidence actually provided to him or his predecessor trustees as *individuals*.

In Montrose v. California, a CERCLA action, the district court for the Central District of California treated the agency of which the Trustee was head as a "trustee agency" and held the Trustee accountable for the knowledge of "employees within the governmental agencies with a duty to transmit the necessary information."  883 F. Supp. 1396, 1405 (C.D. Cal. 1995).  We agree.  The very purpose of appointing the head of the DPNR as Trustee is to provide him with the knowledge and resources of the agency employees.  A Trustee must be charged with the knowledge of the employees of the agency over which he presides.  Otherwise, a Trustee can avoid the running of the statute of limitations simply by not obtaining information from subordinates.

We conclude that the three-year statute of limitations found in § 113(g)(1)(A) of CERCLA embodies a constructive knowledge standard.  See 42 U.S.C. § 9613(g)(1)(A).  The

-13-

Trustee's claim accrues when he discovered or should have discovered any loss to natural resources and its connection to the release in question. The knowledge, actual or constructive, of predecessor trustees is imputed to the current trustee as is the knowledge, actual or constructive, of the agency the predecessor trustees headed or the current trustee heads.

## II.

In the First Amended Complaint, the Trustee alleges a large number of CERCLA releases and damages to natural resources. Since then, the Trustee has significantly narrowed and clarified the precise CERCLA releases for which he is making claims. Defendants contend that for each of these claims, the Trustee knew or should have known, on or before May 5, 2002, of the release and its connection with losses of natural resources.

The Trustee brings three distinct CERCLA claims against Hovensa and HOVIC (collectively the "oil refinery defendants"). He seeks damages for losses to natural resources from releases of neat methyl-tertiary-butyl ether ("MtBE"),[5] for losses tied to arsenic contamination in the Estate Pearl and Estate Figtree areas, and for losses of marine resources caused by violations of the oil refinery defendants' waste discharge permits. The Trustee is no longer seeking damages under CERCLA for losses due to hydrocarbon contamination, releases of chromium, antimony,

_____

5. MtBE is used as a gasoline additive. Small quantities of MtBE can render large volumes of groundwater unpotable.

nickel, vanadium, lead or mercury, or extensive groundwater
withdrawals leading to seawater intrusion.

The Trustee also brings CERCLA claims against
defendants Century, Vialco, and Lockheed Martin (collectively the
"Century defendants"), SCA and Alcoa (collectively the "Alcoa
defendants"), and SCRG for various losses to natural resources
from releases of hazardous substances contained in red mud from
the alumina refinery.  Specifically, he avers losses to the
Fairplains Well Field, groundwater resources at the alumina
refinery site, and mangroves and wildlife in the Alucroix
Channel.  He has now disclaimed any CERCLA claims for losses due
to petroleum hydrocarbon contamination, the physical impacts of
red mud releases, trichloroethylene contamination, or leaded
gasoline releases.

For each of the remaining claims, defendants contend
that the Trustee knew or should have known of the losses and
their connection to the releases in question on or before May 5,
2002.  We will analyze each claim separately, starting with the
claims against the oil refinery defendants.

The Trustee's first CERCLA claim against the oil
refinery defendants is for losses to natural resources due to
releases of neat MtBE.  He has identified only a single release
of neat MtBE in 1995 into Barren Spot Well #25.[6]  This release,

---

6.  Though not explicitly stated on the record, it appears that
the Barren Spot Well Field contains wells that pump underlying
groundwater for drinking water use in the Virgin Islands.  The
(continued...)

the Trustee contends, contaminated the groundwater under the Refinery and the Barren Spot Well Field.[7]  The Trustee maintains that he first discovered the losses caused by the oil refinery defendants' releases of MtBE when he read the 2004 Final Report by DPNR consultant Natural Resources Consulting, Inc. ("NCRI").

The oil refinery defendants have come forward with a 1995 letter from the Amerada Hess Corporation to the United States Environmental Protection Agency ("EPA") alerting it to a release of neat MtBE.  Benjamin Nazario of DPNR is carbon copied on that letter.[8]  The letter states that it is a follow-up report to an earlier oral notification by Amerada Hess Corporation.  It recounts that "an undetermined quantity of methyl-tertiary-butyl ether (MTBE, CAS# 1634-04-4) was released from a pipeline valve flange gasket, located inside the tank dike northwest of Tank 7405. … The amount spilled was estimated by HOVIC to be 5 gallons."[9]  This is uncontroverted evidence that DPNR, and thus

---

6. (...continued)
Barren Spot Well Field's groundwater supply appears to be connected to the Kingshill Aquifer.

7.  The Trustee concedes that any releases of MtBE mixed with oil fall outside the CERCLA claim.  See Pl.'s Mem. in Opp'n at 20-21. See also 42 U.S.C. § 9601(14).

8.  The letter is addressed to Jeanne Fox, Regional Administrator for the U.S. Environmental Protection Agency.  Mr. Nazario's title is not listed.  The other recipients who were carbon copied are "S. Wm. Stebbins" and "R.T. Erlich."

9.  Amerada Hess Corporation, as the parent company of HOVIC, assumed responsibility for reporting this MtBE spill to DPNR.

the Trustee, had actual knowledge of the 1995 release of neat
MtBE years prior to May 5, 2002.

The oil refinery defendants have also produced abundant
evidence that the Trustee knew or should have known about the
losses to the groundwater resources caused by this MtBE spill.
Defendants have submitted the December 1999 "Hovensa LLC
Comprehensive Workplan - Area of Concern (AOC) No. 3 Workplan
Groundwater Investigation, Delineation and Remedial Alternatives"
("Hovensa Comprehensive Workplan") which is a report regarding
contamination at the oil refinery prepared pursuant to the
Administrative Consent Order signed by HOVIC, Hovensa, and the
EPA.  The defendants have also come forward with numerous copies
of status reports sent to the EPA prior to May 5, 2002.  The
Administrative Consent Order requires that "one (1) copy of each
notice, document, report and other correspondence or submission
required by this Order shall be sent to each of the following
persons at the addresses listed below:  … Mr. Hollis Griffin,
Virgin Islands Department of Planning and Natural Resources."
The Trustee does not dispute that DPNR received copies of each of
these reports before May 5, 2002.

The Hovensa Comprehensive Workplan provides information
about the groundwater testing done after the MtBE spill to
determine whether contamination had occurred and, if so, how it
could be remediated.  The Workplan notes that MtBE is toxic and
mobile in groundwater.  It states that, "Areas at the refinery
known to be affected by MTBE/TAME (groundwater contamination has

been confirmed by sampling) include the Tankfield 6/Gasoline Blending Area and the south side of Lagoon No. 1." Attached to this document are tables showing the groundwater sampling with numerous instances of contamination by MtBE. The status reports contain further details about the quantities of MtBE found in the groundwater at the oil refinery over a course of years.

The record also contains Hovensa's "Comprehensive Investigation and Corrective Measures Study Workplan For AOC No. 3 (Areas Impacted by Dissolved MtBE and/or Oxygenated Ether Constituent Plumes)". This document is marked as received by DPNR on June 12, 2000. It discusses the detection of MtBE in the groundwater near Tankfield 6 in 1998. It notes that MtBE has a strong affinity for dissolving in groundwater and that "[r]eleases of MtBE and oxygenated ether constituents may result in hazardous impacts to human health and the environment."

The groundwater on the oil refinery property is immediately adjacent and connected to the groundwater in and under the Barren Spot Well Fields, as well as all of the groundwater of the Kingshill Aquifer.[10] DPNR, in fact, expressed concern over the losses to groundwater resources from the MtBE contamination on two separate occasions prior to May 5, 2002. On January 16, 2001, Syed Syedali of DPNR wrote a response to the EPA's notice for public comment on its Administrative Consent

_____

10. It is undisputed that the groundwater beneath the Barren Spot Well Fields and in the Kingshill Aquifer are natural resources belonging to the government of the U.S. Virgin Islands. See 42 U.S.C. § 9601(16); see also 12 V.I.C. § 181.

Order with the defendants.  That letter states "we are concerned about non-petroleum contamination, including MTBE sourcing from HOVENSA."  The EPA notified DPNR that MtBE contamination was being monitored and addressed by DPNR.  On January 26, 2001, DPNR sent a letter to the EPA regarding the Administrative Consent Order, in which DPNR stated that, "we are concerned about non-petroleum contamination sourcing from HOVENSA and, as was mentioned above, the potential for CVOC and heavy metal contamination.  While PSPH remedial efforts are relatively straightforward, DPPHC, CVOC, heavy metal and MTBE contamination are much more difficult not only to characterize but also to remediate."[11]

The evidence is uncontradicted that the Trustee discovered or should have discovered the loss to the groundwater and its connection with the MtBE release before May 5, 2002.  For that reason, we will grant summary judgment in favor of Hovensa and HOVIC as to the CERCLA claims concerning MtBE.

The Trustee's second CERCLA claim against the oil refinery defendants is for losses to Estate Pearl and Estate Figtree due to releases of arsenic into the groundwater, a natural resource.  See 42 U.S.C. § 9601(16); see also 12 V.I.C. § 181.  Estates Pearl and Figtree directly abut the oil refinery

---

11.  The acronym CVOC is not explained in the record.  PSPH stands for phase separated petroleum hydrocarbons and DPPHC for dissolved phase petroleum hydrocarbons.  Both of these substances are exempted from CERCLA regulation based on the petroleum exception.  See 42 U.S.C. § 9601(14).

property on its eastern border.  The Trustee admits discovering
elevated arsenic concentrations in the groundwater east of the
refinery in September 2001, during routine sampling.[12]  This
elevated concentration was detected in monitoring Well 626.  In
early 2002, DPNR sought to determine the extent of the arsenic
contamination by installing an additional nine monitoring wells
throughout Estate Pearl.  These wells yielded evidence that
arsenic concentrations were increasing over time.

Defendants have established without contradiction that
DPNR knew of the arsenic releases on the oil refinery property
and of the arsenic contamination in the adjoining Estate Pearl.
They have produced numerous status reports of the HOVIC
Hydrocarbon Recovery Project prepared for the EPA.  Richard
Smullen, the Rule 30(b)(6) witness for Hovensa, testified that in
the normal course of business, the defendants sent copies to DPNR
of reports prepared for the EPA, even though DPNR did not have
regulatory authority over these releases.  The Trustee concedes
that DPNR did receive copies of these reports.  At his
deposition, Syed Syedali, the Rule 30(b)(6) witness for DPNR,
stated that someone at DPNR would be the recipient of notices of
hazardous substances from the refinery despite not having direct
regulatory power.  He confirmed that DPNR did receive reports
concerning the Hydrocarbon Recovery Project cleanup at the
refinery although he did not specify which ones.  Similarly,

---

12. The record identifies this sampling as "RCRA" sampling.  RCRA
stands for "Resource Conservation and Recovery Act."

Nadine Natasha Noorhasan, former DPNR director and another Rule 30(b)(6) witness for DPNR, confirmed that DPNR did receive these reports from the defendants.

The Hydrocarbon Recovery Project status reports reveal detections of arsenic in monitoring wells long prior to May 5, 2002. The August 1998 status report states that 14 metals were detected in the monitoring wells in the Estate Pearl/Estate Figtree area, including arsenic. It notes that of the 14 metals, "arsenic, chromium and nickel were detected above their respective HBCLs. The exceedance [sic] of the arsenic HBCL of 50 [micrograms]/liter occurred in well 626 (109 [micrograms]/liter)." The February 1999 report remarks: "Metal detections included arsenic at 136 [micrograms]/liter and barium at 223 [micrograms]/liter. Of the detections listed above, only benzene and arsenic were detected above their respective HBCLs of 5 and 50 [micrograms]/liter." There are similar reports dated August 1999, February 2000, August 2000, and February 2001.

The Trustee maintains that, despite DPNR being aware of the ongoing arsenic contamination, he cannot be time-barred from bringing this claim because the exact source of the arsenic is in question. He argues that the statute of limitations has not yet been triggered because defendants have taken the position that the arsenic is naturally occurring and not a product of a release from the refinery. He also contends that the CERCLA claim has not yet accrued because he cannot pinpoint whether the contamination came from a reported arsenic release from "knockout

pots" on the western part of the refinery or an undetected release from "knockout pots" on the eastern part of the refinery. Defendants argue that the accrual of the CERCLA claim is unaffected by their denial that the arsenic contamination began from a release at the refinery or the lack of specificity regarding the precise source of the release.

The Trustee's argument is unavailing. He has admitted that he had knowledge that arsenic was released from the oil refinery and that it was detected in the groundwater in nearby Estate Pearl prior to May 5, 2002. Estate Figtree directly abuts Estate Pearl and shares groundwater resources with it. A reasonable Trustee with this knowledge should have connected the arsenic contamination with the arsenic release on adjacent property. The lack of specificity regarding the pinpoint source location on the oil refinery property should not bar a Trustee from discovering the loss and will not prevent the CERCLA claim from accruing.[13] We will grant summary judgment in favor of Hovensa and HOVIC on the Trustee's CERCLA claim regarding arsenic contamination.

The Trustee's third CERCLA claim against the oil refinery defendants is for losses to natural marine resources due

_____

13. We note that our ruling on this claim is premised on the the Trustee's concession that he knew of an arsenic release on the oil refinery property but did not know the exact source within the property boundaries. We will not speculate as to the outcome where a Trustee knows of contamination and knows of releases from two separate parcels but cannot ascertain from which of two parcels the release came.

to releases of hazardous substances, such as phenolic compounds and waste oil, in excess of defendants' permitted limits. On August 16, 1996, DPNR granted the defendants a "Territorial Pollutant Discharge Elimination System (TPDES) Permit." This permit allowed defendants to make releases into the environment within certain limits. Any releases of hazardous substances in excess of the permitted limits can expose defendants to CERCLA liability. See 42 U.S.C. § 9601(10). The Trustee claims that defendants exceeded these limits and that those CERCLA-controlled releases caused a loss to marine resources.

On April 9, 2003, DPNR instituted a proceeding against Hovensa for unlawfully exceeding its permit limits from January 2001 to February 2003. In its 2004 Final Report, consultant NCRI found that these non-permitted releases were highly likely to contribute to the loss of marine resources. The Trustee argues that he did not discover the losses to marine resources until receipt of the 2004 Final Report.

The oil refinery defendants point to the deposition of Robert T. Erlich, a Rule 30(b)(6) witness for HOVIC, who testified that the defendants have filed monthly Discharge Monitoring Reports (DMRs) with DPNR since 1990, which cataloged the contents and quantity of their wastewater releases. Bruce Green, a Rule 30(b)(6) witness for DPNR, stated at his deposition that DPNR received DMRs from the defendants, which he reviewed in preparing his 2004 Final Report.

Defendants, however, have not produced the actual copies of these DMRs. Without these copies, genuine issues of material fact exist as to whether the DMRs did or should have alerted DPNR to CERCLA releases prior to May 5, 2002.

Further, defendants have not come forward with any evidence showing that the Trustee knew or should have known of any losses to natural resources caused by the alleged discharges before May 5, 2002.[14] They contend that DPNR discovered the loss in 2001 when NCRI produced to DPNR a draft of their 2004 Final Report. Defendants have produced a draft which contains the same information, phrased in nearly identical words, regarding losses to marine life as the 2004 Final Report. It is their position that a reasonable Trustee in possession of this report should have discovered the losses to marine life and the connection between those losses and the releases in question.

The draft report, however, is undated, and the Trustee disputes that it dates from 2001. Instead, the Trustee contends that it more likely was given to DPNR in mid- to late-2002. The parties make a variety of arguments regarding circumstantial evidence that may indicate the report's date. If the report was produced in 2001, as defendants contend, the Trustee's claim

---

14. Defendants assert that the court should enter judgment in their favor on this claim because the Trustee has not come forward with any evidence that a loss to the marine environment abutting the oil refinery exists. This argument in unavailing. Defendants bear the burden of proving that the Trustee's claim is time-barred because he discovered or should have discovered the loss on or before May 5, 2002. Discovery on the merits of the case has not yet concluded.

would be time-barred.  If the report was produced after May 5, 2002, as the Trustee contends, the claim would have been brought within the statute of limitations.  There are genuine issues of material fact as to the date of the report.  Therefore, we will deny defendants' motion for summary judgment on the Trustee's CERCLA claim with regard to losses to marine life caused by discharges of hazardous substances in excess of permitted amounts.

We now turn to the Trustee's claims against the alumina defendants:  Century, Vialco, and Lockheed Martin (collectively the "Century defendants"), SCA and Alcoa (collectively the "Alcoa defendants"), and SCRG.  The alumina refining process creates a byproduct known as red mud, which the alumina refinery operators deposited to dry in large piles on the refinery property.  In his First Amended Complaint, the Trustee alleges that these defendants allowed the red mud, which contains caustic and hazardous substances, to escape from the refinery property.  The mud, according to the Trustee, escaped both gradually, as "tailings" or erosion from the piles, starting in the early 1990's, and in a massive release caused by the collapse of an improperly stacked drying pile that occurred in March 2002.  The Trustee states that the red mud caused three discrete and identifiable losses for which he is seeking damages.  They are: (1) the loss to the Fairplains Well Field; (2) losses to on-site groundwater resources on refinery property; and (3) losses to mangroves and wildlife in the Alucroix Channel.

As to the gradual "tailings" of red mud off of the
refinery property, defendants have first come forward with a 1993
report entitled "Southshore [sic] Industrial Area; Area of
Particular Concern (APC) Draft Management Plan," prepared for
DPNR by an outside consultant.  This report reads in relevant
part:

> Runoff from the red mud tailings of the
> VIALCO alumina plant operations are another
> source of water pollution.  While surface
> runoff into the cooling ponds in allowed,
> excessive nutrient loading (from the
> tailings) has resulted in algal blooms in the
> cooling ponds.  Currently, suspended solids
> (comprised of filamentous blue-green algae
> and trace metals, including arsenic,
> chromium, copper, zinc and lead) are being
> discharged into the Alucroix Channel.  Algal
> growth is spreading throughout the upper
> reaches of the channel.  Algal blooms, if
> unchecked, deplete dissolved oxygen in marine
> waters and subsequent health and mortality
> effects on marine organisms.

This section makes clear that DPNR, and thus the Trustee, had
knowledge prior to May 5, 2002 of the loss to natural resources
in the Alucroix Channel and their connection to the red mud
"tailings."

The Trustee also knew or should have known about the
losses to the Fairplains Well Field and the connection to the red
mud tailings before May 5, 2002.  The First Amended Complaint
itself states that:

> In August, 1991, all seven wells at WAPA's
> Fairplains Well Field were shut down as a
> result of excessive total dissolved solids
> ("TDS") as measured by conductivity.  This
> well field is located west of the ALUMINA
> FACILITY and immediately adjacent to the red

> mud piles and cooling ponds. The excessive
> TDS concentrations have been caused by
> activities at the ALUMINA FACILITY. These
> seven wells remain closed.[15]

The Trustee has here conceded that he had knowledge of the loss
of the Fairplains Well Field in 1991. HOVIC alerted Benjamin
Nazario of the DPNR to the WAPA shut-down of the Fairplains Well
Field by September 1, 1994. Given that the Trustee also learned
of the releases of red mud from the property from the 1993 Draft
Management Plan report, a reasonable Trustee should have
connected the dissolved solids in the well field groundwater to
the contaminated cooling ponds of the alumina refinery tract
located "immediately adjacent" to the well field.

Ǎ  The Trustee argues that he did not learn of the
connection between the dissolved solids in the well field and the
red mud tailings until receipt of the 2004 NCRI Final Report. He
contends that the 2004 report was the first indication to him
that if the Fairplains Well Field were to resume pumping, it
would likely capture contaminated groundwater from the vicinity
of the red mud disposal area. He states that it was not possible
to draw this conclusion prior to this time when the analysis of
the 2001 Wellhead Protection Project Report data could be
completed.

---

15. WAPA is the Virgin Islands Water and Power Authority. It
operates the Fairplains Well Field, which is an area with wells
used to extract groundwater for various uses in the Virgin
Islands. This groundwater is a natural resource under both
federal and territorial law. <u>See</u> 42 U.S.C. § 9601(16); 12 V.I.C.
§ 181.

We are not persuaded.  DPNR knew that the well field
was contaminated in 1991.  It also knew of releases adjacent to
the well field as early as 1993.  Furthermore, by 2001, DPNR had
commissioned and received the raw data from the Wellhead
Protection Project, a field study which included sampling from
the Fairplains Well Field.  The data was later analyzed to show
contamination from the red mud disposal area.  Though the Trustee
may not have had actual knowledge on or before May 5, 2002, a
reasonable Trustee should have known of the connection between
the releases and the loss of the well field by 2001, at the
latest.  His failure to analyze the data generated in that report
until a much later date amounts to willful blindness.

The Trustee also alleges that the red mud tailings
caused losses to the groundwater on-site at the alumina refinery.
Although defendants have produced numerous documents showing
DPNR's knowledge of on-site groundwater pollution, all of those
documents relate to a 2001 sulfuric acid spill.  To the extent
that the Trustee is alleging that any loss to groundwater
resources was connected to a sulfuric acid release, his claim is
out of time.  However, there remain genuine issues of material
fact as to whether the Trustee knew or should have known about
the groundwater pollution's alleged connection with the red mud
tailings.  To the extent that the Trustee alleges such a
connection, his claim may proceed at this time.

As to the Trustee's claims for losses caused by red mud
"tailings," we will grant summary judgment in favor of the

alumina defendants for losses to the Alucroix Channel and Fairplains Well Field. We will deny their motion for summary judgment as to losses to on-site groundwater resources on the alumina refinery tract allegedly caused by red mud tailings.

The Trustee further maintains that he did not discover the losses to natural resources caused by the March 2002 release of red mud until after May 5, 2002. He asserts that this large release over a short period of time caused bivalve deaths, decreased the quantity and variety of marine life, and stressed and killed mangrove trees.[16] He argues that he did not learn of these losses until receiving a report from a DPNR consultant on May 28, 2002, which documented elevated pH, the absence of plant life, abundant green algae, and dead bivalves.

Regardless of when DPNR learned of the March 2002 red mud release and the resulting losses, defendants Lockheed Martin, Vialco, and Century Alumina are not liable under CERCLA. They did not own or operate the alumina refinery at the time of the release and are not the current owners or operators. Defendants SCA and Alcoa retain liability for any claims as the owners and operators at the time of the alleged release, and defendant SCRG retains liability for any claims as the current owner.

---

16. A "bivalve" is defined as "a mollusk, as an oyster or claim, with a two-hinged shell." Webster's II New College Dictionary 114 (Houghton Mifflin Co. 1995). Such wildlife are included in the natural resources protected by CERCLA. See 42 U.S.C. § 9601(16).

The record discloses uncontroverted evidence that DPNR knew of the March 2002 release of red mud prior to May 5, 2002. An April 17, 2002 letter from St. Croix Alumina to Hollis Griffin, a DPNR employee, reads:

> On April 16th, 2002, St. Croix Alumina L.L.C. became aware that stormwater runoff containing settleable solids from the residue storage area had reached across SCA property to mangrove areas and the ocean at a point immediately adjacent to the Anguilla landfill. The incident was reported to Aaron Hutchins of your staff at 17:00 on April 16th. This event did not appear to be recent but is believed to be related to the heavy rainfall event that occurred on the island approximately one month ago. ... The original extent of the material carried by the stormwater is unknown.

Whether the Trustee was or should have been aware of the losses to natural resources caused by this release is less clear. Defendants have come forward with a report by BioImpact entitled, "Assessment of the Extent of the Red Mud Spill and Impact Assessment at the St. Croix Alumina L.L.C. Facility," dated April 20, 2002. A June 12, 2002 Administrative Order from DPNR states that St. Croix Alumina delivered this report to DPNR on May 3, 2002. The BioImpact report describes in great detail the extent of the red mud spill and the impacts observed during a detailed survey of the alumina refinery property on April 17, 18, and 19, 2002.

The BioImpact Report, however, does not describe any of the losses to natural resources for which the Trustee now seeks damages. The report notes that seagrass and other herbaceous

plants were crushed or smothered when the red mud flowed through the channel.  The Trustee, however, has not sought damages for those particular losses.  He seeks damages to the natural resources of the Alucroix Channel based on the caustic and hazardous properties of the substances found in red mud, including bivalve death, decreases in marine life, and harm to mangrove trees.  The BioImpact Report specifically notes that none of those losses was discernable during the inspection on April 17, 18, and 19, 2002.  Among other passages that indicate minimal damages to natural resources, the report includes these statements:

> Water stands among the roots and the water appears red.  This is due to the deposition of the red mud particulate.  The water is actually clear.  Crabs have burrowed through the deposited red mud.  The mangroves, primarily reds, but with black and white both present, do not appear stressed.  They have good leaf color and the red mangroves are actively producing propagules.
>
> There are numerous small mangroves and mangrove seedlings within the area none appear to be negatively impacted by the deposited mud.
>
> The mud also coated some of the small mangrove seedlings and saplings.  This will interfere with photosynthesis and could have a detrimental effect on some of the small plants.  However with the heavy rains over the weekend of April 20, 2002. [sic]  Much of the sediment is being washed off.

The report as a whole conveys that there is minimal, if any, loss to the mangroves or other natural resources caused by this

release of red mud.  No trustee could be expected to discover losses to natural resources based merely on the BioImpact report.

Defendants have not come forward with any other evidence showing that the Trustee discovered or should have discovered these losses occurring in the Alucroix Channel on or before May 5, 2002.  We will deny defendants' motion for summary judgment for losses to the Alucroix Channel due to the March 2002 release of red mud.