IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

COMMISSIONER OF THE DEPARTMENT :     CIVIL ACTION
OF PLANNING AND NATURAL       :
RESOURCES, ALICIA V. BARNES,   :
et al.                         :
                          :
        v.              :
                          :
CENTURY ALUMINUM COMPANY,      :
et al.                         :     NO. 05-62

<u>MEMORANDUM</u>

Bartle, J.                                   February 13, 2012

        Before the court is the motion of certain settling parties to approve a consent decree in an environmental action.

        Plaintiffs, Commissioner of the U.S. Virgin Islands Department of Planning and Natural Resources, Alicia V. Barnes ("the Commissioner"), and the Government of the Virgin Islands (together with the Commissioner, "the Government"), have filed this multi-count environmental lawsuit against entities who at various times owned portions of an industrial area in Kingshill, St. Croix on which both an alumina refinery and an oil refinery have operated.  The defendants are Century Aluminum Company ("Century"),[1] Virgin Islands Alumina Corporation ("VIALCO"), St. Croix Alumina, LLC ("SCA"), Lockheed Martin Corporation

———————————

1.  Century was named a defendant in this action, but the court granted summary judgment in its favor on November 30, 2011.  <u>See Dep't of Planning & Natural Res. v. Century Aluminum Co.</u>, No. 05-62, 2011 U.S. Dist. LEXIS 137431 (D.V.I. Nov. 30, 2011).

("Lockheed"), Alcoa World Alumina, LLC, ("Alcoa"), St. Croix Renaissance Group, LLLP ("SCRG"), HOVENSA, LLC ("HOVENSA") and Hess Oil Virgin Islands Corporation ("HOVIC").[2]

In Count VI of its first amended complaint, the Government alleges that the defendants are liable for natural resource damage under the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607.  There are also five counts under Virgin Islands law: strict liability for an abnormally dangerous activity (Count I); negligence (Count II); negligence per se (Count III); public nuisance (Count IV); and a claim under the Virgin Islands Oil Spill Prevention and Pollution Control Act, 12 V.I.C. § 701, et seq. (Count V).

Three of the defendants, SCA, Alcoa, and SCRG (collectively "the Setting Defendants" and together with the Government, "the Settling Parties"), have now negotiated a settlement with the Government that would resolve all of the Government's claims against the Settling Defendants, including the CERCLA claim in Count VI of the first amended complaint.

As required by CERCLA, the Settling Parties have filed a motion for entry of a consent decree approving the terms of their proposed settlement.  42 U.S.C. § 9622(d)(1)(A); see In Re

_____

2. The Virgin Islands Port Authority ("VIPA") and the Virgin Islands Waste Management Authority ("VIWMA") are third-party defendants sued by defendants Vialco and Lockheed and former defendant Century for contribution under CERCLA and Virgin Islands law.

-2-

Tutu Water Wells CERCLA Litig., 326 F.3d 201, 206 (3d Cir. 2003).
The other defendants to this case, VIALCO, Lockheed, HOVENSA, and
HOVIC (collectively the "Non-Settling Defendants"), oppose the
terms of the proposed consent decree.[3]  The court held a public
hearing and argument on the pending motion after giving notice to
the public and providing for a comment period.

                              II.

          The property at issue in this litigation consists of
approximately 1,400 acres on St. Croix's southern shore and is
known as the South Coast Industrial Area.[4]  It is bounded by the
Caribbean Sea on the south, Route 68 on the north, and Route 62
on the east.  The Area contains an eastern tract which is
occupied by an oil refinery and a western tract on which once
operated an alumina refinery.  Beneath the South Coast Industrial
Area is a large body of fresh water known as the Kingshill
Aquifer.  The Alucroix Channel extends from the Caribbean Sea
into the South Coast Industrial Area.

          The now-shuttered alumina refinery on the South Coast
Industrial Area was built in 1965 by Harvey Aluminum Virgin
Islands, Inc., a wholly-owned subsidiary of Harvey Aluminum
Incorporated.  In 1972, after Martin Marietta Corporation gained

_____

3.  VIPA and VIWMA are not parties to the proposed consent decree
presently before the court and have not opposed entry of the
consent decree.

4.  The first amended complaint also refers to the tracts as the
"South Central Industrial Area" and the "Southshore Industrial
Area."

a controlling share in Harvey Alumina Incorporated, Harvey
Aluminum Virgin Islands, Inc. was renamed Martin Marietta
Aluminum, Inc. ("Martin Marietta").  Martin Marietta processed
alumina in the refinery until May 1985.  It has since merged into
Lockheed.

In May 1989, Vialco purchased the alumina refinery from
Martin Marietta and processed alumina there until January 1995.
In April 1995, Century acquired Vialco, and in July 1995, Vialco
sold the alumina refinery property to SCA.  SCA, a subsidiary of
Alcoa, owned the refinery between July 1995 and 2002 but operated
the refinery only between 1998 and 2000.  In 2002, SCA sold the
alumina refinery property to SCRG, its current owner.  SCRG has
never operated the refinery.  The court will refer to Lockheed,
Vialco, SCA, Alcoa, and SCRG collectively as the "Alumina
Defendants."

In this case, the Government contends that the
operation of the alumina refinery damaged the natural resources
of the Virgin Islands.  Specifically, the Government alleges that
a high-pH substance known as "red mud," an environmentally
deleterious byproduct of alumina refining, has contaminated the
environs surrounding the alumina refinery.

The alumina refining process involved the extraction of
alumina from bauxite ore using the Bayer process.  This ore was
mined elsewhere and shipped into St. Croix.  The Bayer process at
the refinery involved:  (1) crushing and grinding bauxite ore;
(2) dissolution of alumina hydrates with a caustic soda at high

-4-

temperatures and pressures; (3) removing impurities via
separation and clarification; and (4) calcination and
precipitation of alumina.  The process yields two primary
residual substances, sand and dirt.  The dirt is also known as
bauxite residue, that is red mud.  Each of the defendant alumina
refinery operators treated the red mud to reduce its pH and to
remove chemical compounds that could be reused in alumina
refining.  The treated red mud, which is still toxic, was
deposited nearby in piles to dry.

Between 1967 and 1972, Martin Marietta disposed of the
red mud on a part of the South Coast Industrial Area immediately
west of the Alucroix Channel that the parties refer to as "Area
B."  In 1972, Area B was closed and was not used for red mud
disposal by any subsequent Alumina Defendant.  Beginning in 1972,
Martin Marietta began storing the red mud on a portion of the
property known as "Area A," which consists of 62 acres northwest
of Area B.  The two subsequent refinery operators, Vialco and
SCA, deposited all the red mud they created in Area A only.  All
deposits of red mud ceased in 2000 when SCA ended alumina
refining operations at the facility.  In early 2002, in
connection with its sale of the refinery property to SCRG, SCA
re-graded the red mud piles in Area A.

Experts retained by the parties have attempted to
calculate the amount of red mud that each of the various alumina

-5-

refinery owners produced.[5]  H. James Reisinger, hired by SCRG, prepared a report in which he compared five different methods of calculating the red mud each alumina refinery owner generated. These calculations considered production data from the three refinery operators, the amount of time each of those companies owned the facility, and the production capacity of the refinery during the companies' respective periods of ownership.  Each of these methods yielded largely similar results, and Reisinger took an average of the five calculations.  Using this average, he opined that Martin Marietta, Vialco, and SCA were responsible for the following percentage of the red mud deposited on the refinery property, that is, both Areas A and B:

        - Martin Marietta:  63.9%

        - Vialco:          24.2%

        - SCA:             11.9%

Reisinger performed three subsequent analyses in which he separately considered the respective contributions of these three companies to the red mud deposited in Area A.  The average of these three analyses showed that they are responsible for the following percentages of the red mud in Area A only:

        - Martin Marietta:  57.5%

---

5.  The expert opinions were obtained by the parties in a related action, Dep't of Planning and Natural Res. v. St. Croix Renaissance Grp., et al., no. 07-114 (D.V.I.), discussed below, that also concerned alleged environmental damage to the South Shore Industrial Area arising from operation of the alumina refinery.  Each Alumina Defendant was also a defendant in Civil Action 07-114.

- Vialco:              28.5%

- SCA:                14.0%

Peter Messard, Lockheed's expert, calculated the volume
of red mud each party deposited onto Area A by considering the
amount of alumina each refinery operator produced after 1971.  As
noted above, Martin Marietta closed Area B in 1972.  Messard
concluded that the three refinery operators produced the
following percentage of the red mud deposited in Area A:

- Martin Marietta:  62.7%

- Vialco:              25.2%

- SCA:                12.1%

Messard, however, noted that SCA had re-graded the surface of
Area A in 2002 in connection with its sale of the refinery to
SCRG.  In Messard's opinion, this re-grading was a significant
cause of red mud erosion after 2002.  Messard determined that SCA
had caused a larger percentage of the natural resource damage at
issue in this case than reflected by production statistics as a
result of its 2002 re-grading.

Jasbinder Singh, the expert for Century and Vialco,
concluded in a report that the refinery operators were
responsible for the following amounts of the red mud in Area A:

- Martin Marietta:  62.05%

- Vialco:              26.33%

- SCA:                11.61%

-7-

In Singh's opinion, however, SCRG also contributed to the natural resource damage at issue in this case by failing to take remedial action after acquiring the refinery property.

Thus, each of these experts determined that the most appropriate starting point for an allocation of the harm done to Area A was to consider the volume of alumina each refinery operator produced and then calculated the quantity of red mud deposited on the property.  The results of each expert's analyses are similar in terms of percentages.

In this action, the Government is seeking to recover under CERCLA for the damage done by the red mud to the natural resources of the Virgin Islands.  Specifically, the Government alleges that the red mud has caused damage by contaminating the groundwater beneath the refinery and that it then migrates beyond the refinery property.  The Government also maintains that a large release of red mud into the Alucroix channel in March 2002 caused damage to marine life and mangrove trees.  See Dep't of Planning & Natural Res. v. Century Aluminum Co., No. 05-62, 2010 U.S. Dist. LEXIS 70848, at *36-*45 (D.V.I. July 30, 2010).[6]

While not part of the Government's CERCLA claim, the Government urges the court to consider, in evaluating the proposed consent decree, that winds blow dried red mud into the surrounding residential neighborhoods and cause the red mud to

---

6.  On July 30, 2010, the court awarded summary judgment to the Alumina Defendants with respect to the Government's other claims of natural resource damage under CERCLA on statute of limitations grounds.  Id.

enter cisterns.  The Government further contends that rain brings
about erosion of the red mud into surface water on the refinery
property.

III.

This action by the Government is one of several cases
pending in the courts of the Virgin Islands in connection with
the alleged environmental damage to the South Coast Industrial
Area.  In addition to this case, which was initiated in 2005, the
Government filed in October 2007 a second lawsuit against the
same defendants as in this case.  In the second lawsuit, which we
will call the "Cost Recovery Action," the Government sought to
recover under CERCLA costs for responding to releases or
threatened releases of hazardous substances from the alumina
refinery.  See Dep't of Planning and Natural Res. v. St. Croix
Renaissance Grp. LLLP, No. 07-114, 2011 WL 833227 (D.V.I. Mar. 4,
2011).[7]  The court ruled that the Government has not yet incurred
any response costs that are compensable under the applicable
provision of CERCLA.  Id. at *4-*6.  Accordingly, summary
judgment was granted in favor of defendants.  Id.  That decision
in the Cost Recovery Action is on appeal to the Court of Appeals
for the Third Circuit.

SCRG, the current alumina refinery owner, also filed
suit against SCA, the company from which it purchased the
refinery facility in 2002.  We will refer to this case as "the

_____

7.  The Government did not name HOVIC or HOVENSA as defendants in
the Cost Recovery Action.

-9-

Contract Action."  In that case, a jury found that SCA
fraudulently induced SCRG to enter into a contract to purchase
the refinery property, breached the terms of certain warranties
embodied in the contract for sale, and negligently performed its
contractual duty to remediate the property in connection with its
sale of the property to SCRG.  See St. Croix Renaissance Grp.
LLLP v. St. Croix Alumina, LLC, No. 04-67, 2011 U.S. Dist. LEXIS
58481, at *2-*4 (D.V.I. May 31, 2011).  The jury awarded SCRG
$12,617,867 for breach of contract and fraud in the inducement,
$10,000,000 as a result of SCA's negligence, and $6,142,856 in
punitive damages.  Id.  The court granted the post-trial motion
of SCA for judgment as a matter of law.  It concluded that SCRG
had failed to prove that SCA was responsible for the negligent
repairs made to the refinery property.  Id. at *5-*10.  The court
also awarded SCRG pre-judgment interest on a portion of the jury
award attributable to its recovery on the breach of contract
claim.  Id. at *35-*39.  On May 31, 2011, an amended judgment was
entered in favor of SCRG in the amount of $20,374,25.  Both
parties have taken appeals from the judgment entered in the
Contract Action.

        In 2006, the Government filed two actions in the
Superior Court for the Virgin Islands related to the South Coast
Industrial Area.  In one of the cases, the Government sued SCA
under the Virgin Islands Water Pollution Act ("VIWPA"), 12 V.I.C.
§ 181 et seq., for alleged discharges of red mud.  In the other,
the Government made claims against SCRG, SCA, and Vialco under

the VIWPA and the federal Costal Zone Management Act.  We will refer to these two actions collectively as "the Superior Court Actions."

In February 2011, while this case, the Cost Recovery Action, the Contract Action, and the Superior Court Actions were all pending, the Government and the Alumina Defendants began negotiating a settlement to resolve all claims among them related to the alumina refinery property.  On February 25, 2011 and July 12, 2011, the Government, Lockheed, SCA, Alcoa, SCRG, Vialco, and Century met with a private mediator in an attempt to achieve a settlement of all claims related to the alumina refinery property.  On August 24, 2011, these parties met with a mediator appointed by the Court of Appeals for the Third Circuit in connection with the appeal of the Cost Recovery Action. Following the mediation before the Third Circuit mediator a term sheet embodying the outline of a possible settlement was shared among counsel for all of these parties except Century and Vialco, which had already determined not to participate in a settlement. In September 2011, the Settling Parties elected to move forward without Lockheed and finalized terms.  HOVIC and HOVENSA, the two entities named as defendants over alleged environmental damage arising from the oil refinery, never participated in the settlement discussions pertaining to the alumina refinery property.

IV.

The Settling Parties have reached an agreement that
would resolve all of the claims among them in this case, the Cost
Recovery Action, the Superior Court Actions, and the Contract
Action.[8]  These actions would be dismissed as to the Settling
Defendants but not as to the Non-Settling Defendants.  The
settlement also resolves any other past, present, or future
claims among the Settling Parties related to response costs,
damages, or natural resource damage resulting from the presence
of hazardous materials on the site of the former alumina
refinery.

Rather than specifying a specific sum of money the
Settling Defendants must pay the Government to resolve these many
cases and claims, the proposed consent decree describes generally
a series of remedial activities the Settling Defendants will
perform or finance.  The actions to be taken by the Settling
Defendants are set forth in a "Statement of Work" appended to the
proposed consent decree.  The Statement of Work does not "provide
task-specific engineering or geological guidance" but instead
sets forth a broad framework for performing agreed-upon
corrective measures.

_____

8.   SCRG, SCA, and Alcoa have separately negotiated a settlement
agreement among themselves that relates to their performance
under the proposed consent decree.  The terms of that agreement
are not before the court for approval or germane to the analysis
we undertake below.

-12-

The corrective measures described in general terms in the Statement of Work propose to remedy natural resource damage done to Area A, a storm water settling basin to the south of Area A ("the Settling Basin"), and a body of water southwest of the Settling Basin known as "the Upper Cooling Pond."  During periods of rain, storm water currently flows from Area A into the Settling Basin and then into the Upper Cooling Pond.  Satellite images of Area A and the two downstream bodies of water show deposits of red mud.

In general terms, the Settling Defendants have agreed to perform certain studies, stabilize and contour Area A, remediate the Settling Basin and the Upper Cooling Pond, and implement a stormwater management program.  The Statement of Work provides that SCA must undertake remedial action in Area A that will ensure the red mud piles are stabilized, covered with vegetation, and capable of proper drainage.  This work must afford:

> i. Protection against catastrophic release of storm water and/or [red mud];
> ii. Protection against erosion of the vegetative cover and [red mud];
> iii. Protection against dusting (wind erosion);
> iv. Protection of surface water quality;
> v. Restoration of vegetation on the surface of Area A; and
> vi. Protection of and long term restoration of area of the Property downstream from Area A.

The Settling Basin will be cleared of red mud to ensure that it can serve as a storm water "surge buffer" between Area A

-13-

and the Upper Cooling Pond.  The Statement of Work stipulates
that any red mud from Area A should be retained in the Settling
Basin so it does not migrate to the Upper Cooling Pond.  The
Settling Basin will be cleared of red mud as needed.

With regard to the Upper Cooling Pond, the Statement of
Work primarily sets out various options the Settling Parties may
pursue depending on the results of a hydrology and hydraulics
study to be performed after the proposed consent decree is
approved.  The Statement of Work recognizes that the Upper
Cooling Pond has been "silted in" with red mud from Area A.
Depending on the information obtained from the hydrology and
hydraulics study, the Settling Parties will determine whether
this red mud silt should be removed or whether the remedial
activities should focus on preventing further migration with the
addition of soil and vegetation.  The Statement of Work does not
provide for any specific actions to be taken with respect to the
Upper Cooling Pond, focusing instead on describing the
information that must be obtained before a work plan can be
devised for that body of water.

The Statement of Work then delineates a schedule for
performing the necessary study and devising a work plan.  Within
120 days of the approval of the proposed settlement, SCA will
submit to DPNR a "pre-design work plan" and a schedule for
performing the hydrology and hydraulics study, a study to
evaluate the soils and plant materials needed to re-vegetate the
Upper Cooling Pond and Area A, and any other studies SCA

-14-

considers necessary to completing the settlement's remedial goals. The Statement of Work provides that during the next 105 days, the Settling Parties will consult with each other and with a specified contractor to develop an agreed-upon schedule and pre-work plan. Once the schedule and pre-work plan are approved, SCA will consult with DPNR, SCRG, and the contractor quarterly to discuss progress. Depending on the results of the various studies, the Settling Parties and their contractor will collaborate and repeat this process as needed until they are prepared to draft a "final implementation plan and schedule."

The final implementation plan and schedule must achieve the remediation goals for each area. More specific remediation goals for the Upper Cooling Pond will be determined once the results of the various studies are known. The Statement of Work provides that all Settling Parties and the selected contractor will have the opportunity to comment on the proposed final implementation plan and schedule, which must be approved in writing by DPNR. During performance of the remedial activities described in the final implementation plan and schedule, SCA will consult quarterly with DPNR, SCRG, and the contractor.

Once SCA determines all remedial activities have been performed, it will submit an "as-built implementation report" and a "maintenance/monitoring/inspection plan" to DPNR and the contractor. The Statement of Work provides a process for DPNR and the contractor to dispute whether SCA has materially accomplished the settlement's remediation goals. Once DPNR and

-15-

the contractor approve the as-built implementation report and the maintenance/monitoring/inspection plan, SCA will begin submitting quarterly "maintenance, monitoring and inspection reports" to DPNR, the contractor, and SCRG.  After SCA submits eight quarterly maintenance, monitoring and inspection reports and "any deficiencies have been corrected," DPNR will issue a "no further action notice."  When the no further action notice is issued, all maintenance, monitoring, and inspection obligations will pass to SCRG, and SCA will have no further obligation with respect to the alumina property.

The Statement of Work does not provide for any measures to be taken in Area B, the Alucroix Channel, the oil refinery, or a body of water downstream from the Upper Cooling Pond called the Lower Cooling Pond.  As noted previously, only Martin Marietta, Lockheed's predecessor, placed red mud in Area B.  Litigation will continue against the Non-Settling Defendants.

The proposed consent decree states that in the event disagreements arise about compliance with the terms of the settlement, the parties will informally negotiate to resolve the dispute.  In the event informal negotiation fails, the parties have agreed to submit the dispute to binding arbitration.  The proposed settlement also includes a series of escalating monetary penalties for noncompliance with an arbitrator's decision.

SCA or Alcoa will pay $3 million to the Government of the Virgin Islands to reimburse its costs and attorneys fees for bringing the various lawsuits related to the alumina refinery

property.  SCA also will pay the contractor's fees for overseeing various aspects of the corrective measures.  Alcoa "will arrange for a corporate guarantee" of the work SCA has agreed to perform.

In accordance with CERCLA, the proposed settlement protects the Settling Defendants from contribution claims by the Non-Settling Defendants "for all matters addressed" in the settlement.  See 42 U.S.C. § 9613(f)(2).  Additionally, the settlement limits the ability of the Government to collect from the Non-Settling Defendants.  Paragraph 61 states that the settlement

> constitutes a waiver by DPNR, the Trustee and the Government of any portion of any judgment that has been or may be obtained from or against any Non-Settling Party(ies) or other persons or entities that may be allocated to any of the Settling Defendants for which the Non-Settling Party(ies) could collect against any one or more of the Settling Defendants.

Thus, this paragraph prevents the Government from pursuing the Non-Settling Defendants for natural resource damage caused by any of the Settling Defendants.

The Settling Defendants have made an open-ended financial commitment to perform certain remedial work on Area A, the Settling Basin, and the Upper Cooling Pond.  No firm estimate yet exists of the cost to the Settling Defendants to perform all corrective measures required in the Statement of Work.  However, the contractor who will oversee the corrective measures has estimated that the cost to close and vegetate Area A alone will range between $26.5 and $29.5 million.  SCA has agreed to fund

-17-

the repairs, whatever their cost, and Alcoa has agreed to
guarantee SCA's performance.  SCRG will bear the cost of
indefinite monitoring, maintenance, and inspection of Area A, the
Settling Basin, and the Upper Cooling Pond.  In return, the
Government has promised to dismiss all claims against Settling
Defendants and not to pursue any other legal action with respect
to alleged environmental damage at the decommissioned alumina
refinery.  The Commissioner has determined that by paying $3
million and funding the remediation and monitoring described in
the Statement of Work, the Settling Defendants will satisfy any
liability they have for natural resource damage to the environs
of the alumina property.

V.

CERCLA was enacted by Congress in 1980 "in response to
the serious environmental and health risks posed by industrial
pollution."  See Burlington N. & Santa Fe Ry. Co. v. United
States, 556 U.S. 599, 129 S.Ct. 1870, 1874 (2009).  The statute
contains many different provisions, including several which allow
states and territories to bring civil actions to recoup damages
caused by the release of environmentally hazardous substance.
See United States v. Bestfoods, 524 U.S. 51, 52 (1998).  Section
107 (42 U.S.C. § 9607) allows a state's natural resources trustee
to bring a claim for damages to natural resources under the
state's trusteeship.  See 42 U.S.C. § 9607(f)(2)(B).[9]  Such

_____

9.  State trustees can also bring claims to recover the costs
(continued...)

natural resources are defined as:  "land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States ... any State or local government, any foreign government, [or] any Indian tribe..."  42 U.S.C. § 9601(16).  The term "state" includes the United States Virgin Islands, and the Commissioner is the Virgin Islands' natural resources trustee.  See 42 U.S.C. §§ 9601(27), 9607(f)(2)(B).

The CERCLA statute explicitly favors early settlements between the government and potentially responsible parties if settlement is in the public interest.  42 U.S.C. § 9622(a); In re Tutu Wells, 326 F.3d at 206.  Section 9622(a) requires the government to enter into negotiated settlement agreements "[w]henever practical and in the public interest ... to expedite effective remedial actions and minimize litigation."  42 U.S.C. § 9622(a).  As noted above, CERCLA settlements reached between state natural resources trustees and potentially responsible parties must be reviewed and approved by the court.  Id. at § 9622(d)(1)(A); In re Tutu Wells, 326 F.3d at 206.

"A court should approve a consent decree if it is fair, reasonable, and consistent with CERCLA's goals."  In re Tutu

---

9.(...continued)
incurred in cleaning up releases of toxic materials.  See 42 U.S.C. § 9601(g)(2).  DPNR brought such a claim in the Cost Recovery Case.  See Dep't of Planning and Natural Res. v. St. Croix Renaissance Group LLC, et al., D.V.I. Civ.A. No. 07-114.

Wells, 326 F.3d at 207; see United States v. SEPTA, 235 F.3d 817, 823 (3d Cir. 2000).  The proposed consent decree must be "in the public interest."  42 U.S.C. § 9622(a); In re Tutu Wells, 326 F.3d at 206.  When considering a proposed consent decree, the court gives deference to the judgment of the government agency that negotiated the consent decree and to the law's preference for settlements.  In re Tutu Wells, 326 F.3d at 207.  As the Court of Appeals for the First Circuit observed:

> Respect for the agency's role is heightened
> in a situation where the cards have been
> dealt face up and a crew of sophisticated
> players, with sharply conflicting interests,
> sit at the table.  That so many affected
> parties, themselves knowledgeable and
> represented by experienced lawyers, have
> hammered out an agreement at arm's length and
> advocate its embodiment in a judicial decree,
> itself deserves weight in the ensuing
> balance.

Cannons Eng'g Corp., 899 F.2d at 84; see In re Tutu Wells, 326 F.3d at 208-09.

Fairness has both a procedural and substantive component.  In re Tutu Wells, 326 F.3d at 207.  To gauge procedural fairness we examine the "candor, openness and bargaining balance" of the negotiating process.  Id. (quoting United States v. Cannons Eng'g Corp., 899 F.2d 79, 86 (1st Cir. 1990)).  The terms of a consent decree are substantively fair "if they are based on comparative fault and if liability is apportioned according to rational estimates of the harm each party has caused."  SEPTA, 235 F.3d at 823.  We must uphold any measure of comparative fault that is not "arbitrary, capricious,

and devoid of a rational basis" even if it is not the measure of
fault the court would employ.  Id. at 824 (quoting Cannons Eng'g
Corp., 899 F.2d at 87); see In re Tutu Wells, 326 F.3d at 207.

     To assess the proposed consent decree's reasonableness,
we consider the probability of the settlement resulting in a
cleaner environment, which is "a question of technical adequacy,
primarily concerned with the probable effectiveness of proposed
remedial responses." Cannons Eng'g Corp., 899 F.2d at 89-90.  We
next examine whether the proposed settlement will adequately
compensate the public for the anticipated costs of repairing the
environmental damage in question.  Id. at 90.  We also weigh the
relative strength of the parties' litigating positions while
bearing in mind that a settlement saves all parties the cost of
litigation.  Id.

     Next, we evaluate the proposed consent decree's
fidelity to the goals of CERCLA, which are to provide the
Government with the tools necessary to ensure the removal of
toxic substances and to place the cost for that removal upon the
parties responsible for emitting those substances into the
environment.  Burlington N. & Santa Fe Ry., 129 S.Ct. at 1874; In
re Tutu Wells, 326 F.3d at 206.  Overall, we consider whether the
proposed consent decree is in the public interest.  In re Tutu
Wells, 326 F.3d at 206.

     The Non-Settling Defendants contend that the proposed
consent decree is unfair, unreasonable, and inconsistent with the
goals of CERCLA.  Lockheed and Vialco first argue that the

-21-

process that lead to the proposed consent decree was procedurally
unfair because they were not included in the settlement
negotiations.  This is not the case.  As explained above, counsel
for all of the Alumina Defendants, including Lockheed and Vialco,
participated in mediation sessions in February, July, and August
2011.  After Vialco declined to participate in any settlement,
the other Settling Parties excluded it from negotiations.
Lockheed continued to express interest in settlement as late as
August 4, 2011, but in September 2011, the Settling Parties
elected to move forward without Lockheed after it failed to
respond to inquiries regarding its participation.  Thus, each of
the Alumina Defendants was represented by counsel during the
settlement negotiations and had the opportunity to participate in
a settlement.  Based on the record before us, we find that the
settlement process was procedurally fair.

        Each of the Non-Settling Defendants contends that the
proposed consent decree is substantively unfair.  One objection
raised by all Non-Settling Defendants is that the Settling
Parties have not provided a value of either the claims being
compromised or the work the Settling Defendants have agreed to
perform in the Statement of Work.  The Non-Settling Defendants
maintain that the proposed consent decree does not address what
resources were damaged, how the damage occurred, the value of
those resources, how the proposed consent decree will restore the
damaged natural resources, and what percentage of damaged
resources the proposed remedial actions would restore.  They

argue that the court is therefore unable to ascertain whether the
Settling Defendants would pay an amount that appropriately
reflects the harm the Settling Defendants have done to the
natural resources at issue in this litigation.

        The Non-Settling Defendants are correct that the
proposed consent decree does not reflect a settlement based on a
dollar-and-cents comparison of the damage done to the environment
and the remedial work the Settling Defendants will fund.
Nevertheless, the court is persuaded that the proposed consent
decree is "based on comparative fault" and that "liability is
apportioned according to rational estimates of the harm each
party has caused."  See SEPTA, 235 F.3d at 823.

        The proposed consent decree is substantively fair in
light of the volume of red mud the various Alumina Defendants
deposited in Area A.  Each of the experts who provided an opinion
in this case concluded that Martin Marietta, predecessor to
Lockheed, and Vialco deposited the vast majority of the red mud
in that location.  While SCA contributed only a small fraction of
the red mud in Area A, it has agreed to fund nearly all of the
corrective measures described in the Statement of Work.  Although
SCA contributed less than 15% of the red mud to Area A, it is
financing nearly 100% of the repairs to that portion of the
facility.  Even if Lockheed's expert, Peter Messard, is correct
that SCA caused the majority of the environmental damage at issue
in this case by improperly re-grading the Area A red mud piles in
2002, this proposed consent decree accounts for that increased

-23-

culpability by placing on SCA nearly all of the cost for repairing Area A.[10]

Furthermore, it is not now possible to determine the cost of the tasks required under the Statement of Work with greater certainty as the Non-Settling Defendants would require. As noted in that document, studies are required to ascertain the specific repairs that must be performed to contain the red mud properly so as to prevent future damage to natural resources. To delay the entry of the proposed consent decree until the full cost of the corrective measures is known would significantly delay any remediation, to the detriment of the people and natural resources of the Virgin Islands.

We see nothing substantively unfair to the Non-Settling Defendants in allowing the Settling Defendants to resolve the various actions against them by funding the tasks described in the Statement of Work notwithstanding that the proposed consent decree is silent on how much those tasks will cost. The Non-Settling Defendants have nothing to fear. First, under CERCLA, settlements reduce the liability of non-settling defendants by the amount of the settlement. 42 U.S.C. §§ 9613(f)(2). Thus, the value of natural resource damage done by Settling Defendants that is paid by them may not be recovered from the Non-Settling

---

10. There has been some suggestion that SCA will use the money it is obligated to pay SCRG under the amended judgment in the Contract Action to fund the repairs described in the Statement of Work. As noted above, however, the amended judgment in the Contract Action is on appeal so that SCA's obligation to pay SCRG is not yet final at this time.

Defendants.  See 42 U.S.C. §§ 9613(f)(2), 9622(c)(2); United
States v. Occidental Chem. Corp., 200 F.3d 143, 150 (3d Cir.
1999); see also SEPTA, 235 F.3d at 824.

Moreover, Paragraph 61 of the proposed consent decree
provides additional protections for the Non-Settling Defendants.
That paragraph adopts the general Virgin Islands rule of
contribution as expressed in § 16 of the Restatement of Torts.
See 1 V.I.C. § 4; RESTATEMENT (THIRD) OF TORTS § 16.  Under that
rule, the damages a plaintiff can recover are reduced by "the
comparative share of damages attributable to a settling
tortfeasor who otherwise would have been liable for contribution
to jointly and severally liable defendants who do not settle."
RESTATEMENT (THIRD) OF TORTS § 16.  Thus, under the proposed consent
decree, the Non-Settling Defendants will face liability only for
the damage they caused to the environment and will not face any
greater liability because the Settling Defendants are out of the
case.  Contrary to the suggestions of the Non-Settling
Defendants, paragraph 61 does not make the proposed consent
decree substantively unfair to them.

Vialco objects to the proposed consent decree as
substantively unfair because it purportedly limits Vialco's
ability to enforce an indemnity clause in the 1995 contract for
the sale of the alumina refinery to SCA and Alcoa.  Vialco
asserts that under the indemnity clause, SCA and Alcoa assumed
liability for any red mud that existed on the premises at the
time of the sale.  While the consent decree would prevent Vialco

-25-

from bringing an action in contribution against all Settling Defendants, including SCA and Alcoa, nothing in the proposed consent decree limits the ability of Vialco to enforce any contractual rights, such as a right to indemnity, that may exist under its contract with SCA or Alcoa.[11]  See 42 U.S.C. § 9613(f)(1)-(2).  Paragraph 9 of the proposed consent decree explicitly states that it resolves certain claims that have been brought or could have been brought "among the Settling Parties only."

We next consider whether the proposed consent decree is reasonable.  As noted above, this is "a question of technical adequacy" requiring us to consider how likely it is that the proposed remedial steps will result in an improved environment. Cannons Eng'q Corp., 899 F.2d at 89-90.  The Non-Settling Defendants object to the reasonableness of the proposed consent decree on the ground that it is insufficiently definite.  They argue that the court cannot approve this consent decree without greater specificity in the Statement of Work.  We disagree.

The Statement of Work sets forth a detailed list of goals that the Settling Parties will accomplish using a collaborative process described in that document.  It is not possible at this date to be more specific.  The lack of specificity of which the Non-Settling Defendants complain will be

---

11.  Vialco did not assert a crossclaim against SCA or Alcoa in this case with regard to any indemnity agreement that may exist in the 1995 sales contract.

-26-

remedied after the parties conduct various studies to determine precisely what activities will be most efficacious in keeping the red mud in Area A from further damaging natural resources.  A schedule for performing the necessary studies also is set forth in the Statement of Work.  Even without a complete list of concrete tasks to be performed, all parties to this case concede that the goals proposed in that document are in the public interest.

Further, settlement is reasonable because the CERCLA claims related to the alumina refinery in this case and the Cost Recovery Action are very limited in scope.  In this case, the Government's CERCLA claim against the Alumina Defendants is limited to allegations that erosion from the red mud piles contaminated the groundwater at the alumina refinery and that the release of red mud in March 2002 caused damage to natural resources in the Alucroix Channel.  Dep't of Planning & Natural Res. v. Century Aluminum Co., No. 05-62, 2010 U.S. Dist. LEXIS 70848, at *36-*45 (D.V.I. July 30, 2010).[12]

Notwithstanding the narrow compass of the CERCLA claim, the Statement of Work in the proposed consent decree sets the goal of completely preventing further erosion of red mud from Area A.  The Statement of Work, outlined above, describes a

---

12.  In the Cost Recovery Action, the court found that the Government has not yet incurred any response costs associated with the alumina refinery that are compensable under CERCLA. Dep't of Planning and Natural Res. v. St. Croix Renaissance Grp. LLLP, no. 07-114, 2011 WL 833227, at *4-*6 (D.V.I. Mar. 4, 2011).

process for developing and executing a remedial response that
will contain further damage from Area A to the environment
through wind and water erosion or through red mud percolating
into the groundwater.  Thus, the planned remedial response not
only would address the sources of natural resource damage at
issue in this case but would go further and ensure that the red
mud in Area A is secured and does not further damage the South
Coast Industrial Area or the surrounding communities.

        Non-Settling Defendants HOVENSA and HOVIC argue that
the court should disapprove the proposed consent decree as
unreasonable because it does not address the Government's
allegation that a petroleum plume exists in the subterranean
Kingshill Aquifer as a result of operations at both the oil and
alumina refineries.  While it is true that the proposed consent
decree does not deal with this so-called "commingled petroleum
plume," this omission is immaterial to our consideration of the
proposed consent decree.  The Government's CERCLA claim against
HOVENSA and HOVIC no longer includes any allegations concerning
contamination to the Kingshill Aquifer.  Dep't of Planning &
Natural Res. v. Century Aluminum Co., No. 05-62, 2010 U.S. Dist.
LEXIS 70848, at *26-*29 (D.V.I. July 30, 2010).

        The absence of third party defendants VIPA and VIWMA
also does not justify withholding approval of the proposed
consent decree as the Non-Settling Defendants suggest.  VIPA and
VIWMA are not parties to the CERCLA claims presently before the
court.  The consent decree does not purport to affect the right

-28-

of third-party plaintiffs Vialco and Lockheed to pursue their claims against these third-party defendants.[13]

> We acknowledge that the U.S. Environmental Protection Agency ("EPA") is currently studying the conditions at the South Coast Industrial Area and has a right to bring a CERCLA claim in the future.  Nonetheless, no reason exists to delay resolution of the Government's claims in this case simply because another governmental plaintiff may later assert environmental claims, including CERCLA claims, against some or all of the defendants in this case.

> The U.S. Department of Justice submitted a comment suggesting that the court add language to the consent decree explicitly stating that the settlement does not limit the ability of the United States to bring its own CERCLA claims against the Settling Defendants and that payments made under the settlement are not payments for injury to natural resources under the trusteeship of a federal resources trustee.  There is no need for any such language in the consent decree.  The proposed consent decree does not purport to limit the ability of the United States to bring any claims, and as noted above, the proposed consent decree explicitly states that the settlement only resolves legal claims among the Settling Parties, which, of course, does not include the United States.  The law is clear that any consent

---

13.  Century was a third-party plaintiff on the contribution claims against VIPA and VIWMA, but as noted previously, the court has granted summary judgment in favor of Century.

decree cannot limit the power of the United States when it is not a party.  See Hathorn v. Lovorn, 457 U.S. 255, 268 n.23 (1982). Thus, no additional language is necessary.

Next, we consider whether the settlement is consistent with the goals of CERCLA.  To the extent the Non-Settling Defendants argue that the settlement is inconsistent with the goals of CERCLA, they do so because it would terminate their right of contribution against the Settling Defendants.  This is a moot point because, as noted above, the Government has waived any right to recover from a Non-Settling Defendant for damage attributable to a Settling Defendant.  Thus, these Non-Settling Defendants will have no need to bring actions in contribution against the Settling Defendants.[14]

We find that the proposed consent decree is consistent with CERCLA because it results in the Settling Parties paying to remedy at least as much environmental resource damage as they caused.  See In re Tutu Wells, 326 F.3d at 207.  CERCLA encourages early settlements.  SEPTA, 235 F.3d at 823; Cannons Eng'q Corp., 899 F.2d at 91-92.  While this case has already been pending for many years, resolving this case at this point still forestalls dispositive motions by the Settling Parties and narrows the issues that may have to be tried.  Approval of the consent decree will allow the Settling Defendants to expend their

---

14.  As observed above, the proposed consent decree does not affect any contractual remedy that any Non-Settling Defendant may have against a Settling Defendant.

time and money in repairing the serious environmental damage to
Area A, the Settling Basin, and the Upper Cooling Pond rather
than litigating with the government over the precise scope of
their liability.  The court is persuaded that the proposed
consent decree, including its plan for repairing and preventing
natural resource damage, is consistent with CERCLA's preference
for settlement, the principle that the polluter should pay for
the natural resource damage it causes, and the statutory goal of
restoring damaged natural resources.

         Finally, the court is convinced that the settlement
embodied in the proposed consent decree is in the public
interest.  Indeed, at the oral argument before the court on
January 12, 2012, all parties, including the Non-Settling
Defendants, conceded that the proposed consent decree was in the
interest of the people of the Virgin Islands.  This settlement
provides a framework for preventing future erosion of red mud
from Area A.  Containing the red mud will significantly reduce
the harm done to the communities near the alumina refinery by the
unsecured, eroding piles of red mud present in Area A.  Red mud
from the alumina refinery——visible in satellite images taken from
the air——contaminates the surface water and groundwater on the
refinery property.  The Government maintains that winds also
carry the red mud onto nearby private property where it enters
cisterns.  This settlement will result in the Settling Parties
taking the steps needed to stabilize the red mud piles through
re-grading and vegetation and thereby control erosion from both

-31-

wind and rain.  The cost of the restoration set forth in the
Statement of Work will be borne only by the Settling Defendants.
While the cost is still unknown, clearly it will be in the
millions of dollars.  Moreover, the Government will receive $3
million to compensate it for a portion of its expenses in
bringing these environmental actions against the Settling
Parties.

     The public interest will be well served because the
people of the Virgin Islands and their property will be protected
from further contamination from the red mud in Area A, economic
development in the South Coast Industrial Area will be fostered,
and the heavy monetary litigation burdens borne by the Virgin
Islands government will be reduced.  Significantly, all of these
benefits will begin to take place sooner rather than later if the
proposed consent decree is approved.

     In sum, we owe deference to the government agencies
involved in negotiating the settlement embodied in the proposed
consent decree and to their judgment that this settlement is an
appropriate resolution of the CERCLA claim in this case.  See In
re Tutu Wells, 326 F.3d at 208-09; Cannons Eng'g Corp., 899 F.2d
at 84.  We conclude that the proposed consent decree is fair,
reasonable, and consistent with the goals of CERCLA.  In re Tutu
Wells, 326 F.3d at 206-07; SEPTA, 235 F.3d at 823.  It is in the
best interest of the people and the natural resources of the
Virgin Islands.  In re Tutu Wells, 326 F.3d at 206.  Accordingly,

the court will grant the motion of the Settling Parties to
approve the proposed consent decree.