IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

COMMISSIONER OF THE DEPARTMENT  :        CIVIL ACTION
OF PLANNING AND NATURAL         :
RESOURCES, ALICIA V. BARNES,    :
et al.                          :
                                :
        v.                      :
                                :
CENTURY ALUMINUM COMPANY,       :
et al.                          :        NO. 05-62


MEMORANDUM


Bartle, J.                                     May 24, 2012

        Before the court is the motion of defendant Lockheed

Martin Corporation ("Lockheed") for summary judgment as to

certain counts of the first amended complaint.

        Plaintiffs, Alicia V. Barnes, Commissioner of the U.S.

Virgin Islands Department of Planning and Natural Resources (the

"Commissioner"), and the Government of the Virgin Islands have

filed this multi-count environmental lawsuit against defendants

who at various times owned portions of an industrial tract in

Kingshill, St. Croix on which both an alumina refinery and an oil

refinery have operated.  They are Century Aluminum Company

("Century"), Virgin Islands Alumina Corporation ("VIALCO"), St.

Croix Alumina, LLC ("SCA"), Lockheed, Alcoa World Alumina, LLC,

("Alcoa"), St. Croix Renaissance Group, LLLP ("SCRG"), HOVENSA,

LLC ("HOVENSA") and Hess Oil Virgin Islands Corporation ("HOVIC").[1]

The six counts in the first amended complaint relate to alleged environmental damage allegedly caused by the defendants' operation of the two refineries. In Count I, the Government of the Virgin Islands alleges that defendants are strictly liable for the environmental damage because they engaged in an abnormally dangerous activity. The Government avers in Count II that defendants are liable for environmental damage due to their negligence and in Count III that defendants acted negligently per se by failing to comply with certain Virgin Islands environmental laws and an order from the federal Environmental Protection Agency. Count IV pleads that the defendants' discharge of certain chemicals constitutes a public nuisance. Count V asserts defendants' liability to the Government for environmental damage under the Virgin Islands Oil Spill Prevention and Pollution

_____

1. Century was named a defendant in this action, but the court granted summary judgment in its favor on November 30, 2011. See Dep't of Planning & Natural Res. v. Century Alumina Co., No. 05-62, 2011 U.S. Dist. LEXIS 137431 (D.V.I. Nov. 30, 2011). On February 13, 2012, the court approved a settlement between plaintiffs and defendants SCA, Alcoa, and SCRG that resolved all claims among these parties. See Dep't of Planning & Natural Res. v. Century Aluminum Co., No. 05-62, 2012 U.S. Dist. LEXIS 17546 (D.V.I. Feb. 13, 2012). Thus, plaintiffs' claims remain pending against VIALCO, Lockheed, HOVENSA, and HOVIC. The Virgin Islands Port Authority ("VIPA") and the Virgin Islands Waste Management Authority ("VIWMA") are third-party defendants sued by defendants VIALCO and Lockheed and former defendant Century for contribution under CERCLA and Virgin Islands law. These defendants' claims against VIPA and VIWMA are not implicated by the motion of Lockheed for summary judgment now before the court.

Control Act, 12 V.I.C. § 701, et seq.  Finally, in Count VI, the
Commissioner has brought a claim under the federal Comprehensive
Environmental Response, Compensation, and Liability Act
("CERCLA"), 42 U.S.C. § 9607, to recover for alleged natural
resources damage to the environs surrounding the refineries.

Lockheed seeks summary judgment in its favor on Counts
I through IV and Count VI to the extent plaintiffs seek in those
counts to recover for alleged environmental damage to the ground
water under the portion of the industrial tract that Lockheed
previously owned.  The issue before the court is limited to
whether Lockheed had an ownership interest in the ground water so
as to preclude any claims under CERCLA and the common law
counts.[2]

I.

Summary judgment is appropriate "if the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c)(2); see also Celotex Corp. v. Catrett, 477
U.S. 317, 323 (1986).  A dispute is genuine if the evidence is

---

2.  In its motion, Lockheed presented other arguments concerning
the Commissioner's ability to prevail on the CERCLA claim in
Count VI of the first amended complaint.  At the time Lockheed
filed this motion, expert discovery had not commenced.  As a
result, the court denied the motion of Lockheed for summary
judgment without prejudice to the extent it addressed matters
other than those related to the ownership of the ground water
beneath the alumina property.  See Dep't of Planning & Natural
Res. v. Century Aluminum Co., No. 05-62 (D.V.I. Feb. 14, 2012)
(order denying motions for summary judgment).

such that a reasonable jury could return a verdict for the non-
moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254
(1986).  After reviewing the evidence, the court makes all
reasonable inferences from the evidence in the light most
favorable to the non-movant.  In re Flat Glass Antitrust Litig.,
385 F.3d 350, 357 (3d Cir. 2004).

                              II.

          The following facts are undisputed or are viewed in the
light most favorable to plaintiffs, the non-moving parties.

          The property at issue in this litigation consists of
approximately 1,400 acres on St. Croix's southern shore and is
known as the South Coast Industrial Area.  It is bounded by the
Caribbean Sea on the south, Route 68 on the north, and Route 62
on the east, and contains the Alucroix Channel and an important
commercial port.  There is no dispute that the Kingshill Aquifer
lies beneath the South Coast Industrial Area.  The land of this
industrial property consists of an eastern tract which is
occupied by an oil refinery and a western tract on which once
operated an alumina refinery.  This motion concerns only the
western tract, which we will refer to as the "alumina property."

          Title to the alumina property, which lies above a
portion of the Kingshill Aquifer, passed from Christian VII, King
of Denmark, to its present owner, SCRG, in a series of
transactions and devises spanning nearly 250 years.  The details
of these transactions and devises are undisputed and were
explained in detail in the court's Memorandum of March 11, 2011.

                             -4-

See Dep't of Planning & Natural Res. v. Century Alumina Co., No.
05-62, 2011 U.S. Dist. LEXIS 25123, at *13-*22 (D.V.I. Mar. 11,
2011).  We repeat here only the essential details of that
history.

          Sometime between 1917 and 1962, the Government acquired
title to what is now the alumina property from the West Indian
Sugar Factory, Limited, a Joint Stock Company.  On February 20,
1962, the Fourth Legislature of the Virgin Islands approved Act
No. 814, which authorized the conveyance of several parcels of
land to Harvey Alumina Virgin Islands, Inc. ("Harvey") for the
purpose of the construction of an alumina refinery.  At the time
the Legislature passed Act No. 814, the parcels of land contained
no industrial development, no channel, and no port.

          Act No. 814 ratified and incorporated by reference an
earlier agreement between Harvey and the Government (the "Grant
Agreement").  The Grant Agreement contemplated that Harvey would
construct an alumina refinery and a "channel and turnabout area"
for access to the property.  It delineated the various benefits
and financial subsidies that the Government would bestow upon
Harvey for the economic development of this parcel, including
pre-approval of necessary zoning, exemptions from various taxes,
fees, and duties, and reimbursement to Harvey from the Government
for the costs of constructing the channel.

          The Grant Agreement also specified that the conveyance
of land from the Government to Harvey would include "without
limitation (i) all mineral, riparian and littoral rights

-5-

thereunto pertaining, (ii) all adjacent tidal flats, lagoons, shorelands and beaches, and (iii) all structures, substructures and improvements, if any, thereon."  The Government promised to convey to Harvey the subject real property "in fee simple absolute, free and clear of all liens, charges, encumbrances, reservations, leases, tenancies, and restrictions on use, sale, exchange, mortgage, pledge or transfer, in whole or in part, whatsoever, except as may otherwise be agreed upon between Harvey and the Government."  The Grant Agreement further provided, "The terms and provisions of this Agreement being contractual and proprietary in nature, it is understood and expressly declared that the Government will not adopt any legislation impairing or limiting the obligation of this contract."

In passing Act No. 814 and ratifying the Grant Agreement, the Legislature of the Virgin Islands found that the arrangement between the Government and Harvey was in the best interest of the people of the Virgin Islands.  It concluded the deal would decrease the Territory's economic dependence on tourism, improve public infrastructure in the form of a new channel and pier, and create new and needed capacity for power and water generation.

After Act No. 814 became law, the Governor of the Virgin Islands signed a deed on May 16, 1962 transferring title of the alumina property to Harvey.  The deed provided in part:

> NOW THEREFORE, The Government of the
> Virgin Islands, in consideration of the
> premises and for other good and valuable

consideration, receipt whereof is hereby
acknowledged, does hereby remise, release,
sell, convey and quitclaim unto Harvey
Aluminum (Incorporated),[3] and to its
successors and assigns forever, all the
right, title, interest, claim and demand
which The Government of the Virgin Islands
has in and to the following described land
situated on the South Coast of the Island of
Saint Croix, Virgin Islands, about midway
between the East and West extreme ends, and
about eight miles from the town of
Christiansted, to wit:

...

INCLUDING, without limitation, (i) all
mineral, riparian and littoral rights
thereunto pertaining, (ii) all adjacent tidal
flats, lagoons, shorelands and beaches, and
(iii) all structures, substructures and
improvements, if any, on the above described
lands.

Together with all and singular the
hereditaments and appurtenances thereunto
belonging, or in any wise appertaining, and
the reversion and reversions, remainder and
remainders, rents, issues and profits thereof
and all the estate, right, title, interest,
claim or demand whatsoever, of the Government
of the Virgin Islands, both in law and in
equity or otherwise, in and to or out of, the
above described lands, with the hereditaments
and appurtenances.

On May 16, 1962, the Government executed a quitclaim deed to the

same real property.  The quitclaim deed also included the

language quoted above.  Neither the deed nor the quitclaim deed

specifically addressed title to ground water.[4]

---

3.  "Harvey Aluminum (Incorporated)" was Harvey's corporate
parent.

4.  For reasons that are not relevant for present purposes, the
Governor of the Virgin Islands signed a second quitclaim deed on
(continued...)

-7-

Harvey completed the construction of the alumina refinery in 1965.[5]  In that same year, the Legislature enacted the Water Resources Conservation Act ("WRCA"), 12 V.I.C. §§ 151-66, which gave the Department of Planning and Natural Resources ("DPNR") authority to regulate, among other things, withdrawals of ground water.  The policy statement enacted as part of the WRCA provides:

> It is hereby declared to be the public policy of the Government of the United States Virgin Islands, in recognition of its sovereign duty to conserve and control its water resources for the benefit of the inhabitants of the United States Virgin Islands, that comprehensive planning and regulation be undertaken for the protection, conservation and development of the water resources of the United States Virgin Islands to the end that they shall not be wasted and shall be used to the fullest extent to meet the present and future needs for domestic, agricultural, commercial, industrial, recreational and other public, beneficial purposes.  It is further declared that an emergency condition exists with respect to the availability of surface and underground water in the United States Virgin Islands and that restrictions are necessary to prevent overpumping of water from wells, the depletion of surface and underground water, the intrusion of salt water and the resultant permanent destruction

---

4.(...continued)
January 15, 1963 to remedy a potential defect in title.  <u>See</u> <u>Dep't of Planning & Natural Res. v. Century Alumina Co.</u>, No. 05-62, 2011 U.S. Dist. LEXIS 25123, at *18-*20 (D.V.I. Mar. 11, 2011).  The language in this second quitclaim deed mirrored the language used in the 1962 deed and quitclaim deed.  Like those prior two conveyances, the second quitclaim deed did not specifically address title to ground water.

5.  In 1964, our Court of Appeals upheld the legality of the Government's transfer of property to Harvey.  <u>See</u> <u>Smith v. Government of Virgin Islands</u>, 329 F.2d 135 (3d Cir. 1964).

> of underground water reservoirs as sources of
> potable water supply.
>
> In view of the foregoing, all waters within
> the United States Virgin Islands are hereby
> declared to be public waters belonging to the
> people of the United States Virgin Islands,
> subject to appropriation for beneficial use
> in the manner set forth in this chapter and
> not otherwise.

12 V.I.C. § 151.

In 1972, after Martin Marietta Corporation gained a controlling share in Harvey's parent company, Harvey was renamed Martin Marietta Aluminum, Inc. ("Martin Marietta").  Martin Marietta processed alumina at the refinery until May 1985.  It has since merged into defendant Lockheed.

In May 1989, VIALCO purchased the alumina refinery from Martin Marietta and processed alumina there until January 1995. In April 1995, Century acquired VIALCO, and in July 1995, VIALCO sold the alumina property to SCA.  SCA, a subsidiary of Alcoa, owned the refinery between July 1995 and 2002 but operated the refinery only between 1998 and 2000.  SCA sold the alumina property to SCRG, its current owner, in 2002.  SCRG has never operated the refinery.  The court will refer to Lockheed, VIALCO, SCA, Alcoa, and SCRG collectively as the "Alumina Defendants."

As noted above, the plaintiffs contend in this lawsuit that the Alumina Defendants' operation of the alumina refinery damaged the natural resources of the Virgin Islands.  Plaintiffs allege that these defendants are responsible for a high-pH substance known as "red mud," an environmentally deleterious

byproduct of alumina refining, which has caused injury to the
environment of the Virgin Islands by contaminating, among other
things, the ground water beneath the alumina property.[6]   See
Dep't of Planning & Natural Res. v. Century Alumina Co., No. 05-
62, 2010 U.S. Dist. LEXIS 70848, at *36-*45 (D.V.I. July 13,
2010).[7]

                                III.

        In its motion for summary judgment, Lockheed argues
that the Alumina Defendants had exclusive ownership and control
of the ground water on the alumina property as a result of the
deeds that Harvey, their predecessor in interest, obtained from
the Government.  In Lockheed's view, the plaintiffs surrendered
any interest in that ground water through the conveyances
described above.  Lockheed asserts that this surrender is fatal
to the Government's common law claims in Counts I through IV and

_____

6.  The process by which bauxite ore was refined into alumina on
the property is explained in greater detail in the court's
Memorandum dated February 13, 2012.  See Dep't of Planning &
Natural Res. v. Century Aluminum Co., No. 05-62, 2012 U.S. Dist.
LEXIS 17546, at *12-*16 (D.V.I. Feb. 13, 2012).

7.  In Count VI, the Commissioner also maintains that a large
release of red mud into the Alucroix channel in March 2002 caused
natural resource damage to marine life and mangrove trees.  See
Dep't of Planning & Natural Res. v. Century Alumina Co., No. 05-
62, 2010 U.S. Dist. LEXIS 70848, at *36-*45 (D.V.I. July 13,
2010).  On July 13, 2010, the court awarded summary judgment to
the Alumina Defendants on Count VI of the first amended complaint
with respect to the Commissioner's other claims of natural
resource damage under CERCLA on statute of limitations grounds.
Id.

                               -10-

the Commissioner's CERCLA claim in Count VI of the first amended complaint.

As a preliminary matter, plaintiffs maintain that the court resolved the issue of ground water ownership in deciding an earlier motion for summary judgment.  Defendant SCRG, which has now settled with plaintiffs, previously moved for summary judgment with respect to Count VI to the extent the Commissioner sought to recover under CERCLA for natural resource damage that red mud allegedly caused to the water in the Alucroix Channel. See Dep't of Planning & Natural Res. v. Century Alumina Co., No. 05-62, 2011 U.S. Dist. LEXIS 25123, at *23-*25 (D.V.I. Mar. 11, 2011).  SCRG argued that it held title to the water in the Alucroix Channel as a result of the series of property transfers described above.  Id.  The court rejected this argument.  It explained that the relevant deed and quitclaim deeds from the Government to Harvey did not convey the waters of or land beneath what is now the Alucroix Channel.  Id. at *23.  Plaintiffs now contend that this ruling is the controlling law of the case as to the issue of ground water ownership.  We are not persuaded.  The law applicable to and the facts involving the Alucroix Channel are simply not the same as the law and facts related to the ground water with which we are concerned here.

The parties have not cited and the court has not found any Virgin Islands statute or case law specifically addressing whether a transfer of real property in fee at the time in question also conveyed ownership of ground water beneath that

-11-

property.  Accordingly, we must look to the common law as required in 1 V.I.C. § 4.  It reads:

> The rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary.

The American Law Institute's Restatement of the Law of Property states that the extent to which a fee simple estate includes percolating waters beneath the surface of real property is set forth in the Restatement of the Law of Torts.  <u>See</u> Restatement of Property ch. 3, topic 2, intro. note (1936).  The Restatement of the Law of Torts, in turn, explains in great detail the various common law doctrines that courts in England and the United States have applied to the ownership of ground water.  <u>See</u> Restatement (Second) of Torts ch. 41, topic 4, intro. note (1979).  The so-called "English rule" was one of "absolute ownership" of the ground water by the landowner.  <u>Id.</u>  The Restatement of Torts states that under the English rule, "ground water is the absolute property of the owner of the freehold, like the rocks, soil and minerals that compose it, so that he is free to withdraw it at will and do with it as he pleases regardless of the effect upon his neighbors."  <u>Id.</u>  Significantly, the Restatement comments that, "[a]lthough framed in property language, the [English] rule was in reality a rule of capture."  <u>Id.</u>

-12-

Nonetheless, courts in the United States, while applying the English rule of ownership, have incorporated prohibitions on wasteful uses of water as well as protections for the wells and springs of adjacent property owners.  Id.  In the United States, the rule was sometimes referred to as a "rule of reasonable use," which "was phrased in terms of the overlying landowner's right to capture ground water."[8]  Id.

After surveying the various common law schemes, the Restatement sets forth a rule of tort liability that subjects overlying property owners to liability only if they make certain unreasonable uses of the ground water beneath their property or cause unreasonable harm to others.  Id. at § 858.  The comments following this section explain that "the property basis of the common law rules pertaining to ground water" is retained and that "the right to withdraw ground water is a property right that may be granted and sold to others."  Id. at §858 cmt. b.[9]

_____

8.  The Restatement also recognizes that many states have adopted statutory systems like the WRCA that alter or replace the common law rules.  See RESTATEMENT (SECOND) OF TORTS ch. 41, topic 4, intro. note (1979).

9.  Because the court must apply the common law as set forth in the Restatement, we do not rely on the common law "as generally understood and applied in the United States."  1 V.I.C. § 4.  We note, however, that several courts have held that an overlying property owner's common law property right to use water beneath the property, even if expressed in terms of "absolute ownership," does not confer ownership of the water itself.  See, e.g., Chino Valley v. Prescott, 638 P.2d 1324, 1328-30 (Ariz. 1981); Village of Tequesta v. Juniper Inlet Corp., 371 So. 2d 663, 672 (Fla. 1979); Reliance Ins. Co. v. Armstrong World Indus., Inc., 678 A.2d 1152 (N.J. Super. Ct. App. Div. 1996).  For example, the
(continued...)

Although property owners have the right to capture and use water found beneath their property, the Restatement of the Law of Torts makes it explicitly clear that "[t]here is no riparian right or privilege to pollute water, nor do landowners have rights to pollute surface and ground water found on or within their land." Id. at § 849 cmt. e.  This is so because "the very existence of man depends upon the preservation and restoration of an environment conducive to his health and well-being." Id.  Pollution of ground water therefore is not considered a "use of water" accruing to overlying property owners.  Id. at §§ 847, 847 cmt. c.  Under the Restatement of the Law of Torts, pollution of ground water may constitute a nuisance.  Id. at §§ 821B, 832.

When the Government sold to Harvey the parcels of real property on which the alumina refinery now stands, it transferred "the entire interest" that it "[had] and [had] the power to convey." 28 V.I.C. § 2.[10]  That included ownership of the ground

_____

9.(...continued)
Supreme Court of Arizona observed, "In the absolute sense, there can be no ownership in seeping and percolating waters until they are reduced to actual possession and control by the person claiming them because of their migratory character." Chino Valley, 638 P.2d at 1328.  Accordingly, several state Supreme Courts have held that statutes like the WRCA that regulate the use of ground water do not constitute an unconstitutional taking by the state.  See id. at 1328-30; Village of Tequesta, 371 So. 2d at 672; Knight v. Grimes, 127 N.W.2d 708, 711-14 (S.D. 1964).

10.  Under Virgin Islands law, "An otherwise effective inter vivos or testamentary conveyance of real property transfers the entire interest which the conveyor has and has the power to
(continued...)

-14-

water on the property, which as explained by the Restatement,
meant Harvey and its successors had the right to capture and use
the ground water on the alumina property.  Nonetheless, that
ownership of the ground water did not entitle Harvey or its
successors to pollute it.

IV.

        We consider first whether Lockheed is entitled to
summary judgment on Count VI under CERCLA.  To prevail on its
CERCLA claim, the Commissioner must prove the existence of
"damages for injury to, destruction of, or loss of natural
resources."  42 U.S.C. § 9607(a)(4)(c).  As defined by CERCLA,
"natural resources" means "land, fish, wildlife, biota, air,
water, ground water, drinking water supplies, and other such
resources belonging to, managed by, held in trust by,
appertaining to, or otherwise controlled by" the Government of
the Virgin Islands.  Id. at §§ 9601(16), (27).  Lockheed
maintains that the ground water beneath the alumina property
cannot fit within this definition because it has been owned by
Harvey or its successors and has been under their exclusive
control since 1962.

_____

10.(...continued)
convey unless an intent to transfer a less interest is
effectively manifested."  28 V.I.C. § 2.  Indeed, the Government
of the Virgin Islands evinced its intent to convey all
transferrable interest in the subject real property to Harvey
when it stated in the 1962 deed that it "does hereby remise,
release, sell, convey and quitclaim unto [Harvey] ... all the
right, title, interest, claim and demand which The Government of
the Virgin Islands has in and to the following described land."

The definition of "natural resources" in § 9601(16)
does not reach "purely private resources." Ohio v. Dep't of
Interior, 880 F.2d 432, 460 (D.C. Cir. 1989).  The Court of
Appeals for the District of Columbia Circuit observed, however,
that "[i]f the words 'managed by, held in trust by, appertaining
to, or otherwise controlled by' mean anything at all, they must
refer to certain types of governmental (federal, state or local)
interests in privately-owned property."  Id.

The parties have not cited and the court has not found
any cases defining "purely private resources," explicating
"governmental ... interests in privately-owned property," or
further elaborating on the statutory definition of "natural
resources" in § 9601(16).  Regulations promulgated by the
Department of the Interior ("Interior") add nothing to the
statutory definition.  See 43 C.F.R. § 11.14(z).

Following a remand from the Court of Appeals for the
District of Columbia Circuit to Interior in the Ohio case,
Interior proposed new regulations concerning the assessment of
natural resource damages.  In responding to public comments
requesting that those regulations include a definition of
excluded private resources, Interior stated:

> Not only is development of a definition of
> the privately owned resources covered by the
> regulations not required by *Ohio v. Interior*,
> it is also impractical.  The question of
> whether a trustee official can assess damages
> for a particular natural resource is governed
> by CERCLA.  However, CERCLA provides that
> trustee officials can only recover damages
> for injuries to those resources that are

-16-

> related to them through ownership,
> management, trust, or control.  These
> relationships are created by other Federal,
> State, local, and tribal laws.  In light of
> the diversity of these other laws, the
> Department believes that the determination of
> whether a particular privately owned resource
> constitutes a natural resource under CERCLA
> is best addressed on a case-by-case basis.

Natural Resource Damage Assessments, 59 Fed. Reg. 14,262, 14,268
(Mar. 25, 1994).  Accordingly, federal law and the law of the
Virgin Islands determines whether and to what extent the water
beneath the alumina property is ground water "belonging to,
managed by, held in trust by, appertaining to, or otherwise
controlled by" the Commissioner, the Virgin Islands' natural
resources trustee.  42 U.S.C. § 9601(16).

Virgin Islands law gives DPNR, over which the
Commissioner presides, expansive authority over the water within
the Territory's boundaries.  The Legislature enacted the WRCA in
1965 "in recognition of its sovereign duty to conserve and
control its water resources for the benefit of the inhabitants of
the United States Virgin Islands" and in order to remedy "an
emergency condition [that] exists with respect to the
availability of surface and underground water in the United
States Virgin Islands."  12 V.I.C. §§ 151, 152(d).  The WRCA
authorizes the DPNR to perform "comprehensive planning and
regulation" of the Territory's waters in order to ensure a supply
of water for competing uses now and in the future.  Id. at § 151.
As noted previously, the WRCA declares that all waters within the
Virgin Islands, including ground waters, belong to the people of

the Virgin Islands.  Id.  The statute allows the DPNR to regulate large withdrawals of ground water by issuing permits.  See id. at §§ 153-55.  Under the WRCA, DPNR must approve the drilling of new wells.  See id. at § 158.  The statute prohibits wasteful uses of water and establishes penalties, including imprisonment, for violations of the statute or implementing regulations promulgated by DPNR.  Id. at §§ 162, 164.

In 1976, the Virgin Islands enacted the Water Pollution Control Act ("WPCA"), 12 V.I.C. §§ 181-98.  The WPCA states that it is the government's policy, among other things, "to provide that no waste be discharged into any waters of the United States Virgin Islands without first receiving the necessary treatment or other corrective action to protect the legitimate beneficial uses of such waters; [and] to provide for the prevention, abatement and control of new or existing water pollution."  Id. at § 181. Among other provisions, the WPCA authorizes DPNR to promulgate water quality standards and "to issue, modify, or revoke orders prohibiting or abating discharges of wastes or pollution into the waters" of the Virgin Islands.  Id. at § 184.  Like the WRCA, the WPCA applies to ground water.  See id. at § 182.

Lockheed asserts that the Government was "forbidden" from enacting legislation subjecting the ground water beneath the refinery to government regulation.  Lockheed contends that the Grant Agreement reflects the Government's intention to give Harvey and its successors complete dominion over the alumina property.  Lockheed observes that the Government promised in the

-18-

Grant Agreement to convey to Harvey the subject real property "in fee simple absolute, free and clear of all liens, charges, encumbrances, reservations, leases, tenancies, and <u>restrictions on use</u>, sale exchange, mortgage, pledge or transfer, in whole or in part, whatsoever, except as may otherwise be agreed upon between Harvey and the Government."  (emphasis supplied.) Lockheed focuses on the Government's pledge not to undermine this promise by later legislative acts.  It points to a provision in the Grant Agreement that states, "The terms and provisions of this Agreement being contractual and proprietary in nature, it is understood and expressly declared that the Government will not adopt any legislation impairing or limiting the obligation of this contract."  Lockheed argues that the Grant Agreement prevented the Legislature "from enacting legislation that would impair the Alumina Defendants' rights under the Grant Agreement," including their rights to the ground water.

Lockheed does not specifically articulate what principle of law prevented the Legislature of the Virgin Islands from subjecting to regulation the ground water beneath the alumina property.  In its brief, however, it cites <u>West Indian Co. v. Gov't of the Virgin Islands</u>, 844 F.2d 1007 (3d Cir. 1988). That case decided an issue under the contract clause of the Revised Organic Act which states, "No law impairing the obligation of contracts shall be enacted."  48 U.S.C. § 1561, ¶ 6.

-19-

The Supreme Court has written that the provision in the United States Constitution forbidding a state from impairing the obligation of contracts[11] "does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 241 (1978) (quoting Manigault v. Springs, 199 U.S. 473, 480 (1905)).  Nevertheless, the state's police powers are not unlimited and the contract clause does "impose *some* limits" on a state's exercise of those powers.  Id.  (emphasis in original). To determine whether a legislature's exercise of its police powers impermissibly impaired contractual obligations, we conduct a three-part inquiry.  See Gen. Motors Corp. v. Romein, 503 U.S. 181, 186 (1992).  We ask "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial."  Id. In the event that a state's exercise of its police powers substantially impairs a contractual relationship, the state must justify its action by demonstrating a "significant and legitimate public purpose behind the regulation ... such as the remedying of a broad and general social or economic problem." Energy Reserves Grp. v. Kan. Power & Light Co., 459 U.S. 400, 411-12 (1983).  If the state's regulation served such a public purpose, we must

---

11.  The Contract Clause in the Constitution provides:  "No State shall ... pass any Law impairing the Obligation of Contracts ..." U.S. Const. art. I, § 10, ¶ 1.

evaluate whether that regulation was "reasonable and necessary" to further the public purpose. U.S. Trust Co., 431 U.S. at 25; see Energy Reserves Grp., 459 U.S. at 412-13.

There can be no dispute that the Grant Agreement between the Government and Harvey, which was approved by Act No. 814, constitutes a contractual relationship.  The Act ratifies and incorporates by reference the Grant Agreement, which "evince[s] a legislative intent to create private rights of a contractual nature enforceable against the State." U.S. Trust Co. v. New Jersey, 431 U.S. 1, 18 n.14 (1977); see West Indian Co., 844 F.2d at 1016-17 & n.15.  Lockheed is the successor in interest to Harvey.

The WRCA purports to allow the Commissioner to regulate withdrawals of all ground water in the Virgin Islands even though, as explained above, the Government previously granted to Harvey and its successors ownership of the ground water on the alumina property, which included the right to withdraw and use ground water. RESTATEMENT (SECOND) OF TORTS ch. 41, topic 4, intro. note, § 858 cmt. b (1979).  The Virgin Islands Government has acted for the benefit of the people of the Territory because of "an emergency condition ... with respect to the availability of surface and underground water." See 12 V.I.C. §§ 151, 153. Lockheed has not adduced any evidence demonstrating that DPNR ever enforced the WRCA so as to prevent it from withdrawing all the water it desired for its operations.  Moreover, as Lockheed points out, the WRCA contains special protections for those using

-21-

ground water prior to the passage of the law, which are referred
to in the act as "vested rights."  See 12 V.I.C. §§ 151(g),
155(a).  The statute provides:

> Applications for permits embodying vested
> rights shall be granted in preference to all
> other applications, except insofar as the
> Government may choose to condemn such rights
> under its powers of eminent domain and pay
> just compensation therefor; provided, that
> such applications and the permits issued
> pursuant to such applications may be denied,
> revoked, or modified when it is found, in
> accordance with section 156(c) of this title,
> that the exercise of rights under the permit
> would imperil the health or welfare of the
> people of the United States Virgin Islands by
> endangering, impairing, or destroying
> available sources of water.

Id. at § 155(a).  Thus, the WRCA permit system is designed to
accommodate those withdrawing water from their property at the
time the bill was passed in 1965.  Even if the WRCA impaired the
Government's contractual obligations to Harvey and its successors
under Act No. 814 or the Grant Agreement, Lockheed has not shown
that any impairment as to it was substantial, whether during or
arising out of its ownership.

Nonetheless, even if the impairment caused by WRCA were
substantial, the Virgin Islands Legislature was acting "to
promote the common weal" and exercising powers "for the general
good of the public."  Allied Structural Steel Co., 438 U.S. at
241.  The court can think of no more "significant and legitimate
public purpose" than the conservation, use, and regulation of a
limited water supply for the benefit of the people of the Virgin
Islands and ultimately for sustaining human life in the

-22-

Territory.  No private party has the right to prevent the Government of the Virgin Islands from exercising its powers in this regard.

The second Virgin Islands statute, the WPCA, cannot be said to impair the Government's obligations under Act No. 814 or the Grant Agreement.  The statute authorizes DPNR, among other things, to regulate the discharge of pollutants into the waters of the Virgin Islands.  See 12 V.I.C. §§ 182, 184.  As shown above, none of the Alumina Defendants ever had the right to pollute the ground water on the alumina property by virtue of their ownership of the overlying land.  RESTATEMENT (SECOND) OF TORTS §§ 832, 847, 847 cmt. c, 849.

Lockheed's reliance on West Indian Co. to support its argument concerning the impairment of the obligation of contract is to no avail.  There, the Government of the Virgin Islands agreed that a company could dredge a portion of a harbor in exchange for the company relinquishing certain rights it held over other portions of the harbor.  Id.  This agreement was ratified by the Virgin Islands Legislature.  When the company began dredging the harbor, the Legislature enacted a new law——over the Governor's veto——repealing its ratification of the agreement with the company.  Id.  The Court of Appeals for the Third Circuit held that the Legislature's about-face violated the contract clause of the Revised Organic Act and could not be justified as an exercise of the Territory's police power.  Id. at 1016-22.  The situation in this case dealing with the use,

-23-

conservation, and regulation of water for the benefit of the people of the Virgin Islands in no way resembles the narrow proprietary circumstances the Court of Appeals considered in West Indian Co.

In sum, the Government transferred to Harvey title to the alumina property, which gave Harvey and its successors the right to capture and use but not the right to pollute the ground water beneath that property.  Subsequently, the laws of the Virgin Islands, specifically the WRCA and WPCA, placed all ground water within the Territory under the management and control of the Commissioner, the Virgin Islands' natural resources trustee. See 42 U.S.C. § 9601(16).  There is no evidence that the WRCA and WPCA substantially impaired the contractual obligation of the Government to Harvey or its successors under Act No. 814 or the Grant Agreement in violation of the contract clause of the Revised Organic Act.  However, even if there was substantial impairment, the Government of the Virgin Islands was justified in doing so.

Whatever ownership interest Lockheed had or retained in the ground water was not so encompassing as to place that interest outside of the reach of CERCLA and its definition of "natural resources."  The ground water in issue here is not a "purely private resource[]" but rather comes within the embrace of CERCLA as a natural resource either "belonging to," or "managed by," or "held in trust by," or "appertaining to," or

"otherwise controlled by" the Government of the Virgin Islands. See 42 U.S.C. § 9601(16); Ohio, 880 F.2d at 460.

Accordingly, the motion of Lockheed for summary judgment on Count VI of the first amended complaint will be denied.

V.

Lockheed also argues that its ownership of the ground water beneath the alumina property entitles it to prevail on the claims of the Virgin Islands Government in Counts I through IV of the first amended complaint. These claims allege Lockheed is liable for environmental damage to the alumina property under theories of strict liability for an abnormally dangerous activity, negligence, negligence per se, and nuisance. Lockheed's argument with respect to these four claims is without merit.[12]

Lockheed maintains that its ownership of the ground water beneath the alumina property deprives the Government of standing to pursue the claims in Counts I through IV. In Lockheed's view, the Government cannot show harm to a "substantial segment" of the Virgin Islands population. The Government brings Counts I through IV in its *parens patriae* capacity. Suits brought in this capacity allow a state to assert

---

12. As noted above, the court previously denied the motion of Lockheed for summary judgment to the extent it addressed matters other than the ownership of the ground water beneath the alumina property. Accordingly, we consider Lockheed's argument with respect to Counts I through IV only as it relates to ground water ownership.

a "quasi-sovereign interest" such as protecting the "health and well-being—both physical and economic" of a "sufficiently substantial segment of its population." Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 607; see Massachusetts v. Envtl. Prot. Agency, 549 U.S. 497, 519-20 & n.17 (2007).

In its *parens patriae* "capacity the State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain.  It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air." Georgia v. Tenn. Copper Co., 206 U.S. 230, 237 (1907).[13]  The Supreme Court has observed that:

> One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.

Alfred L. Snapp, 458 U.S. at 607.  In fact, the Virgin Islands has enacted the WPCA to address contamination of water, including ground water.  See 12 V.I.C. §§ 181-98.  The Government thus has standing to bring a *parens patriae* suit to remedy alleged

---

13.  We note that the states' capacity to bring suit in *parens patriae* to regulate the quality of water within its boundaries has been preempted in part by the federal Clean Water Act.  See Int'l Paper Co. v. Ouellette, 479 U.S. 481, 497-98 (1987).  Under that legislation, however, each state retains its right to use suits at common law, regulatory systems, or statutory schemes, to regulate those within its borders who discharge pollutants into the waters under its jurisdiction.  33 U.S.C. § 1370; Ouellette, 479 U.S. at 497-98.

pollution of ground water, a public resource.  See Tenn. Copper Co., 206 U.S. at 230.  The Restatement of Torts is clear that at common law overlying property owners have the right to capture and use ground water but that their ownership interest in ground water did not bestow a right to pollute it.  Id. at §§ 832, 849, 849 cmt. e.

The motion of Lockheed for summary judgment as to Counts I through IV of the first amended complaint will be denied.