```
              IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
                         DIVISION OF ST. CROIX

COMMISSIONER OF THE DEPARTMENT    :      CIVIL ACTION
OF PLANNING AND NATURAL           :
RESOURCES, ALICIA V. BARNES,      :
et al.                            :
                                  :
          v.                      :
                                  :
CENTURY ALUMINUM COMPANY,         :
et al.                            :      NO. 05-62
```

MEMORANDUM

Bartle, J.                                                                                   June 4, 2012

        Before the court is the motion of HOVENSA, LLC ("HOVENSA") and Hess Oil Virgin Islands Corporation ("HOVIC") (together, the "Refinery Defendants") for partial summary judgment on Counts I through IV of the first amended complaint.

        Plaintiffs, Alicia V. Barnes, Commissioner of the U.S. Virgin Islands Department of Planning and Natural Resources (the "Commissioner"), and the Government of the Virgin Islands (the "Government") have filed this multi-count environmental lawsuit against defendants who at various times owned portions of an industrial tract in Kingshill, St. Croix on which both an alumina refinery and an oil refinery have operated. They are Century Aluminum Company ("Century"), Virgin Islands Alumina Corporation ("VIALCO"), St. Croix Alumina, LLC ("SCA"), Lockheed Martin Corporation ("Lockheed"), Alcoa World Alumina, LLC, ("Alcoa"),

St. Croix Renaissance Group, LLLP ("SCRG"), and the Refinery Defendants.[1]

The Government alleges in Counts I through IV of the first amended complaint that the defendants are liable at common law for contaminating the natural resources of the Virgin Islands in the environs surrounding the industrial tract at issue.  With respect to the Refinery Defendants, the Government contends that they have polluted, among other things, the ground water beneath the property on which their oil refinery is situated.  The Government asserts in Counts I through IV that these two defendants are liable for this ground water pollution under four theories:  strict liability for an abnormally dangerous activity, negligence, negligence per se, and public nuisance.[2]

---

1. Century was named a defendant in this action, but the court granted summary judgment in its favor on November 30, 2011.  See Dep't of Planning & Natural Res. v. Century Alumina Co., No. 05-62, 2011 U.S. Dist. LEXIS 137431 (D.V.I. Nov. 30, 2011).  On February 13, 2012, the court approved a settlement between plaintiffs and defendants SCA, Alcoa, and SCRG that resolved all claims among these parties.  See Dep't of Planning & Natural Res. v. Century Aluminum Co., No. 05-62, 2012 U.S. Dist. LEXIS 17546 (D.V.I. Feb. 13, 2012).  Thus, plaintiffs' claims remain pending against VIALCO, Lockheed, and the Refinery Defendants.  The Virgin Islands Port Authority ("VIPA") and the Virgin Islands Waste Management Authority ("VIWMA") are third-party defendants sued by defendants VIALCO and Lockheed and former defendant Century for contribution under CERCLA and Virgin Islands law.  These defendants' claims against VIPA and VIWMA are not implicated by the motion for summary judgment now before the court.

2. The Commissioner is not a plaintiff on Counts I through IV of the first amended complaint.  The Commissioner alleges in Count VI of the first amended complaint that the Refinery Defendants are liable for natural resource damage under the federal
(continued...)

The Refinery Defendants have moved for summary judgment on Counts I through IV to the extent the Government seeks to recover for pollution of the ground water beneath the property on which the oil refinery is located. They argue that they own that ground water and that the Government cannot establish that the public has been damaged by it. They do not seek summary judgment with respect to their liability for any polluted ground water that has migrated beyond the bounds of their property.

Also before the court is the motion of the Government to deny the motion of the Refinery Defendants for partial summary judgment to the extent it addresses matters other than ownership of the ground water beneath their property.

I.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine if the evidence is

---

2.(...continued)
Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607. The court dismissed on statute of limitations grounds the Commissioner's CERCLA claim against the Refinery Defendants with respect to alleged ground water contamination on the oil refinery property. See Dep't of Planning & Natural Res. v. Century Alumina Co., No. 05-62, 2010 U.S. Dist. LEXIS 70848, at *22-*36 (D.V.I. July 13, 2010). The Commissioner's CERCLA claim in Count VI remains pending with respect to alleged losses of marine life caused by the Refinery Defendants' activities at the refinery. Id.

such that a reasonable jury could return a verdict for the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 254 (1986).  After reviewing the evidence, the court makes all reasonable inferences from the evidence in the light most favorable to the non-movant.  <u>In re Flat Glass Antitrust Litig.</u>, 385 F.3d 350, 357 (3d Cir. 2004).

II.

The property at issue in this litigation consists of approximately 1,400 acres on St. Croix's southern shore and is known as the South Coast Industrial Area.  The South Coast Industrial Area overlies a body of ground water known as the Kingshill Aquifer.  This industrial property consists of an eastern tract which is occupied by an oil refinery and a western tract on which once operated an alumina refinery.  This motion concerns only the eastern tract, which we will refer to as the "oil refinery property."

HOVIC, a corporation organized under the laws of the U.S. Virgin Islands, owned and operated the oil refinery from 1967 until 1998.  In 1998, HOVENSA assumed ownership and operation of the oil refinery.  HOVENSA, a limited liability company organized under the laws of the U.S. Virgin Islands, continues to own and operate the oil refinery.  HOVIC owns fifty percent of HOVENSA.  The other fifty percent is owned by PDVSA V.I., Inc., a wholly-owned subsidiary of Petroleos de Venezuela S.A.  Neither PDVSA V.I., Inc. nor Petroleos de Venezuela, S.A. is a defendant in this case.

In 1965, the Virgin Islands Legislature authorized the Governor to enter into an agreement with HOVIC concerning the construction of an oil refinery.  The Governor and HOVIC reached an agreement in September 1965 under which HOVIC promised to construct an oil refinery on approximately 400 acres of land that it would acquire or lease from a private party or multiple private parties.  The Government approved of the location for the refinery, promised not to enforce certain provisions of Virgin Islands law with respect to the oil refinery, granted HOVIC tax breaks, and agreed to issue licenses and permits required under various Virgin Islands laws to facilitate construction of the refinery.

In "Annex 'A'" to the agreement, HOVIC contracted to dredge a portion of a channel that had been constructed by Harvey Alumina Virgin Islands, Inc. between 1962 and 1965.  That ship channel extends inland from the Caribbean Sea and separates the oil refinery property from the western tract of the South Coast Industrial Area on which the now-shuttered alumina refinery is situated.  The channel includes a ship turnabout area in a body of surface water known as the Krause Lagoon.  In Annex "A," HOVIC was also obligated to dredge the eastern portion of the turnabout area and to construct two docks there, one for its own use and one for use by the public.  Finally, HOVIC was to dredge a third berthing area at which the Government would build at its own expense a dock for public use.  The Government reimbursed HOVIC

for part of its dredging expenses and permitted HOVIC to use the channel for free for 16 years.

In 1976, the Government and HOVIC entered into another agreement under which HOVIC would expand the oil refinery property to include a deep water "containerport," a docking facility for large commercial container ships. As part of the deal, the Government leased to HOVIC 63.37 acres of "reclaimed submerged land" that HOVIC was to use in expanding its refining operations. The lease allowed HOVIC to use the 63.37 acres for twenty years and provided HOVIC an option to renew the lease for four additional twenty-year terms.

In 1981, the Government and HOVIC extended until 1997 the original 1965 agreement. This extension required HOVIC to pay certain taxes and to build two new refining facilities on the oil refinery property.[3] The Government agreed "to vigorously support and assist" HOVIC in obtaining all necessary permits from the federal and Virgin Islands governments to construct such facilities.

In 1982, HOVIC identified oil in the ground water beneath the oil refinery property and notified both the U.S. Environmental Protection Agency ("EPA") and the predecessor agency to the Virgin Islands Department of Planning and Natural

---

3. The extension gave HOVIC the option to build either two fluid catalytic cracking facilities or one fluid catalytic cracking facility and one hydro cracking facility. The differences between these two types of refining facilities are not explained in the record.

Resources ("DPNR").  In response, HOVIC instituted a "Hydrocarbon Recovery Project" to contain and remove hydrocarbons from the ground water.  In 1996, DPNR began issuing the Refinery Defendants permits to withdraw the large volumes of ground water required to implement the Hydrocarbon Recovery Project.[4]  Then, in 1999, the EPA started to require the Refinery Defendants to continue the Hydrocarbon Recovery Project as a condition of receiving an operating permit for the oil refinery.  While the record does not contain any undisputed figures, it is uncontested that the Refinery Defendants have released a substantial quantity of oil into the ground water beneath the oil refinery property.

In addition to the 1981 extension agreement, the Government and HOVIC have agreed on two other occasions to extend the original 1965 agreement.  By 1990, the first of the two refining facilities contemplated in the 1981 extension agreement had not yet been completed.  This was due, HOVIC claimed, to a deterioration in economic conditions.  HOVIC still intended to build at least one new refining facility, and the parties extended their agreement until 16 years after that refining facility became operational.

More recently, in 1998, the Government and HOVIC negotiated a third extension of the 1965 agreement.  This extension states that HOVIC was continuing to experience losses in connection with the refinery and that HOVIC desired to enter a

---

4.  The circumstances under which the Refinery Defendants withdrew ground water prior to 1996 are disputed.

-7-

joint venture with a partner that could invest more money into the refinery.  The agreement contemplated that HOVIC and PDVSA Petróleos y Gas, S.A. would jointly construct a coker refining facility, which would allow the Refinery Defendants to process crude oil from Venezuela.  The recitals to the agreement declared that the joint venture "will afford substantial and continuing benefits to the economy of the Virgin Islands by strengthening the economic and competitive position of the refinery and enhancing its profitability and by substantially preserving jobs."  The parties extended their agreement until 20 years after the coker facility began manufacturing "commercial quantities of marketable products."  The 1998 extension contemplated that the Refinery Defendants would operate the refinery until 2022.[5]

It is undisputed that there are no public wells on the oil refinery property.  The parties also concede that the oil refinery property is secured by fences and the public is not permitted to access the property.

### III.

As noted above, the Refinery Defendants seek partial summary judgment on Counts I through IV of the first amended complaint, which allege common law claims for strict liability for an abnormally dangerous activity, negligence, negligence per se, and public nuisance.  The Refinery Defendants request summary

---

5.  In January 2012, HOVENSA announced that it intended to close the refinery in February 2012 after experiencing losses totaling $1.3 billion over the prior three years.

-8-

judgment on these counts to the extent the Government seeks to recover for contamination to the ground water beneath the oil refinery property. The Refinery Defendants maintain that they own that ground water and that the Government cannot show an injury to the public with respect to it. The Refinery Defendants do not seek summary judgment with respect to their liability for any polluted ground water that has migrated beyond the bounds of the oil refinery property.

The Refinery Defendants attempt to compartmentalize the ground water pollution they have caused in a way that is unsupported by any evidence in the record. No evidence in the record supports an inference that the polluted ground water presently beneath the oil refinery property is isolated from the ground water beneath nearby properties. Nor is there any evidence that the polluted water will stay beneath the Refinery Defendants' property. It is equally plausible on the record before us that the ground water currently beneath the oil refinery property will eventually migrate beyond the bounds of that land and contaminate the ground water beneath other properties. Indeed, there is evidence in the record that such migration has already occurred. Under these circumstances, there is no practical basis for the court to draw a distinction between ground water beneath the oil refinery property and ground water beneath other properties.

The Refinery Defendants contend that the Government cannot prove an injury in fact to the public with respect to the

ground water beneath the oil refinery property because they "own" such ground water. This claim is highly dubious in light of the Virgin Islands Water Resources Conservation Act ("WRCA"), 12 V.I.C. §§ 151-66, which was enacted in 1965 shortly before the Refinery Defendants purchased the land on which the oil refinery subsequently was constructed. Section 151 of the WRCA states:

> [A]ll waters within the United States Virgin Islands are hereby declared to be public waters belonging to the people of the United States Virgin Islands, subject to appropriation for beneficial use in the manner set forth in this chapter and not otherwise.

12 V.I.C. § 151. The WRCA defines "waters" to include ground water. Id. at § 152(d). Thus, when the Refinery Defendants purchased the oil refinery property from private owners, they were on notice that the Virgin Islands Legislature had declared that the ground water beneath the oil refinery property belongs to the people of the Virgin Islands.

Even assuming that the Refinery Defendants have certain indicia of ownership of the ground water beneath their property, they are not permitted to pollute that water. Although property owners had the right at common law to capture and use water found beneath their property, "[t]here is no riparian right or privilege to pollute water, nor do landowners have rights to pollute surface and ground water found on or within their land." RESTATEMENT (SECOND) OF TORTS § 849 cmt. e. This is so because "the very existence of man depends upon the preservation and restoration of an environment conducive to his health and well-

being." Id. Pollution of ground water therefore is not considered a "use of water" accruing to overlying property owners. Id. at §§ 847, 847 cmt. c.[6]

In any event, the Government brings Counts I through IV in its *parens patriae* capacity. Suits brought in this capacity allow a state to assert a "quasi-sovereign interest" such as protecting the "health and well-being—both physical and economic" of a "sufficiently substantial segment of its population." Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 607 (1982); see Massachusetts v. Envtl. Prot. Agency, 549 U.S. 497, 519-20 & n.17 (2007). In its *parens patriae* "capacity the State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air." Georgia v. Tenn. Copper Co., 206 U.S. 230, 237 (1907).[7]

---

6. As we note below, pollution of ground water is also subject to state regulation. The Virgin Islands has enacted the Water Pollution Control Act, 12 V.I.C. §§ 181-98., which allows DPNR to regulate, among other things, pollution of ground water.

7. The states' capacity to bring suit in *parens patriae* to regulate the quality of water within its boundaries has been preempted in part by the federal Clean Water Act. See Int'l Paper Co. v. Ouellette, 479 U.S. 481, 497-98 (1987). Under that legislation, however, each state retains its right to use suits at common law, regulatory systems, or statutory schemes, to regulate those within its borders who discharge pollutants into the waters under its jurisdiction. 33 U.S.C. § 1370; Ouellette, 479 U.S. at 497-98.

Respondents assert that there is no evidence that any pollution to the ground water beneath the oil refinery property causes harm to a "sufficiently substantial segment" of the Virgin Islands population, a requirement for a state to sue in *parens patriae*. See Alfred L. Snapp, 458 U.S. at 607. They note that the oil refinery property is secured by fences and that no wells draw on the water below the property. The Supreme Court has observed that:

> The Court has not attempted to draw any definitive limits on the proportion of the population of the State that must be adversely affected by the challenged behavior. Although more must be alleged than injury to an identifiable group of individual residents, the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population. One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.

Alfred L. Snapp, 458 U.S. at 607. In fact, the Virgin Islands has enacted the Water Pollution Control Act ("WPCA"), 12 V.I.C. §§ 181-98, which permits DPNR, among other things, to promulgate water quality standards and "to issue, modify, or revoke orders prohibiting or abating discharges of wastes or pollution into the waters" of the Virgin Islands. 12 V.I.C. § 184. Like the WRCA, the WPCA applies to ground water. See id. at § 182. Regardless of who owns the ground water beneath the oil refinery property,

the Government has an interest in that ground water at least in its *parens patriae* capacity such that it may bring Counts I through IV of the first amended complaint, whether the ground water at issue is currently accessible or inaccessible to the public.

The nature and extent of any water pollution, and thus the damage and injury to the public that has occurred, if any, cannot be decided here.  Expert discovery in this regard is still ongoing.

Accordingly, to the extent the Refinery Defendants seek partial summary judgment as to Counts I through IV of the first amended complaint due to their purported ownership of the ground water beneath the oil refinery property, we will deny the motion. In all other respects, we will deny the motion of the Refinery Defendants for partial summary judgment without prejudice as premature.

The court will deny as moot the motion of the Government to deny the motion of the Refinery Defendants for partial summary judgment to the extent it addresses matters other than ownership of the ground water beneath their property.