```
            IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
                       DIVISION OF ST. CROIX

COMMISSIONER OF THE DEPARTMENT    :      CIVIL ACTION
OF PLANNING AND NATURAL           :
RESOURCES, ALICIA V. BARNES,      :
et al.                            :
                                  :
          v.                      :
                                  :
CENTURY ALUMINUM COMPANY,         :
et al.                            :      NO. 05-62
```

MEMORANDUM

Bartle, J.                                              June 7, 2013

      Plaintiffs, Commissioner of the United States Virgin Islands Department of Planning and Natural Resources, Alicia V. Barnes (the "Commissioner"), and the Government of the Virgin Islands (together with the Commissioner, the "Government"), filed this multi-count environmental lawsuit against entities who at various times owned portions of an industrial area in Kingshill, St. Croix on which both an alumina refinery and an oil refinery have operated. These defendants were Century Aluminum Company ("Century"), Virgin Islands Alumina Corporation ("VIALCO"), St. Croix Alumina, LLC ("SCA"), Lockheed Martin Corporation ("Lockheed"), Alcoa World Alumina, LLC, ("Alcoa"), St. Croix Renaissance Group, LLLP ("SCRG"), HOVENSA, LLC ("HOVENSA") and Hess Oil Virgin Islands Corporation ("HOVIC").[1]  We have

---

1.  The Virgin Islands Port Authority and the Virgin Islands Waste Management Authority are third-party defendants sued by
(continued...)

previously approved a settlement between the Government and SCA, Alcoa, and SCRG and granted summary judgment in favor of Century. Accordingly, the remaining defendants are VIALCO, Lockheed, HOVENSA, and HOVIC.

There are a number of pending motions under Daubert v. Merrel Dow Pharmaceuticals, 509 U.S. 579 (1993). We will now consider the motion of Lockheed to exclude the opinion testimony of Jack V. Matson, Ph.D. ("Dr. Matson") and the motion of defendants HOVENSA and HOVIC (together, the "Refinery Defendants") to exclude his expert testimony.

I.

The court has a "gatekeeping" function in connection with expert testimony. See Gen. Elec. Co., et al. v. Joiner, 522 U.S. 136, 142 (1997); see also Daubert, 509 U.S. at 589. Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

1.(...continued)
defendants VIALCO and Lockheed and former defendant Century for contribution.

As our Court of Appeals has repeatedly noted, Rule 702 embodies three requirements: qualification, reliability, and fit. Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008).

An expert is qualified if he "possess[es] specialized expertise." Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003). This does not necessarily require formal credentials, as "a broad range of knowledge, skills, and training qualify an expert," and may include informal qualifications such as real-world experience. In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994). The qualification standard is a liberal one, and an expert may be sufficiently qualified under Rule 702 even if "the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996).

To determine reliability, we focus not on the expert's conclusion but on whether that conclusion is "based on the methods and procedures of science rather than on subjective belief or unsupported speculation." Schneider, 320 F.3d at 404 (internal quotation marks omitted). Our analysis may include such factors as:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship

>of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Pineda, 520 F.3d at 247-48.

"[T]he test of reliability is flexible" and this court possesses a broad latitude in determining reliability. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141-42 (1999). To be reliable under Daubert, a party need not prove that his or her expert's opinion is "correct." Paoli, 35 F.3d at 744. Instead:

>As long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process-competing expert testimony and active cross-examination-rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.

United States v. Mitchell, 365 F.3d 215, 244 (3d Cir. 2004) (quoting Ruiz-Troche v. Pepsi Cola Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998)).

As for "fit," expert testimony must also "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Thus, to "fit," such evidence must bear some relation to the "particular disputed factual issues in the case." United States v. Downing, 753 F.2d 1224, 1237 (3d Cir. 1985). Accordingly, this factor has been described as one of relevance. Daubert, 509 U.S. at 591; Paoli, 35 F.3d at 745 & n.13.

II.

Dr. Matson was retained by the plaintiffs in order to evaluate whether the defendants met the industry standard of care for waste disposal. He holds a Ph.D. in Environmental Engineering from Rice University as well as a B.S. and M.S. in Chemical Engineering from the University of Toledo. He is the Emeritus Professor of Environmental Engineering at Pennsylvania State University. He lists his relevant experience as working as an environmental engineering consultant to the chemical industry, as an expert witness in cases involving chemical emissions from manufacturing facilities, and as a process chemical engineer at the Sun Oil refinery in Toledo, Ohio from 1964-1965. Dr. Matson will offer the following opinions:

> Opinion 1: HOVIC knew or should have known its oily sewer system would corrode and leak hydrocarbons into the subsurface because it failed to follow industry practices and standards for corrosion protection of buried pipes....
> Opinion 2: HOVIC knew or should have known its firewater system would corrode and leak saline sea water into the subsurface by failing to meet industry practice and standards for maintaining the cathodic protection system....
> Opinion 3: HOVIC/HOVENSA knew or should have known its aboveground storage tank bottoms would corrode and leak because it failed to provide adequate cathodic protection as defined by industry standard practices....
> Opinion 4: By not following industry inspection practices, HOVIC/HOVENSA failed to find and prevent leaks from its aboveground storage tanks....
> Opinion 5: HOVIC/HOVENSA knew since at least the early 1970s that its operations were causing hydrocarbon releases to the subsurface, but failed to implement an

>    effective prevention program to minimize
>    continued releases.....

                          III.

We will first address the motion of Lockheed to exclude Dr. Matson's testimony.  He evaluated whether Lockheed met the industry standard of care for the disposal of waste streams generated during bauxite refining.  Lockheed argues that Dr. Matson's opinions should be excluded because they purport to decide the ultimate legal issue of the case, that is, breach of the standard of care.  Rule 704 of the Federal Rules of Evidence permits an expert witness to give expert testimony that "embraces an ultimate issue to be decided by the trier of fact."  Fed. R. Evid. 704.  However, "an expert witness is prohibited from rendering a legal opinion."  Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006) (citing United States v. Leo, 941 F.2d 181, 195-96 (3d Cir. 1991)).  "Such testimony is prohibited because it would usurp the District Court's pivotal role in explaining the law to the jury."  Id. (citing First Nat'l State Bank v. Reliance Elec. Co., 668 F.2d 725, 731 (3d Cir. 1981) (per curiam)).

In Berckeley, our Court of Appeals explained that "the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often become blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties."  455 F.3d at 218.  There, an expert in securities litigation wished to testify

-6-

that it was reasonable for the appellant to have believed it was entitled to a certain exemption under the securities laws if it sold any shares.  The court looked to First National State Bank, 668 F.2d at 731 and Leo, 941 F.2d at 195-97 for guidance as to where to draw this line.

In First National State Bank, our Court of Appeals affirmed a district court's decision to permit an expert to testify as to the established custom in the banking industry and to provide background information to help the jury determine whether the bank's conduct warranted status akin to a holder in due course but to preclude the expert's opinion as to the legal duties arising from the industry custom which would deny the bank holder-in-due-course status.  668 F.2d at 731.  In Leo, our Court of Appeals similarly affirmed a district court's decision to permit an expert to testify as to the custom and practices of the defense industry as long as the testimony was limited to an explanation of business custom and not as to what was required under the law or whether the defendant complied with the law. 941 F.2d at 197.  Based on these cases, the court held in Berckeley that the expert in that case was permitted to testify about the customs and business practices in the security industry but not as to whether the plaintiff complied with legal duties that arose under federal securities laws.  455 F. 3d at 218.

Dr. Matson's analysis of whether Lockheed met the industry standard of care for the disposal of waste streams generated during bauxite refining was based on his review of EPA

-7-

documents and peer reviewed literature. The EPA documents implicate legal duties since they describe the required method of disposal. Based on these documents as compared to Lockheed's disposal practices, Dr. Matson opined in his report, and wishes to testify to that effect, that Lockheed did not meet the industry standard of care by discharging bauxite refining waste streams into on-site ponds and did not prevent migration of those waste streams from the ponds into the environment. Under <u>Berckeley</u>, <u>First National State Bank</u>, and <u>Leo</u>, Dr. Matson is precluded from testifying about what EPA regulations required or about whether Lockheed complied with these regulations. However, he may testify as to the customs and practices of the industry so long as he does not implicate any legal duty.

## IV.

The Refinery Defendants also move to exclude the opinions of Dr. Matson. Dr. Matson prepared a separate report with regard to the plaintiffs' claims against the Refinery Defendants and does not reference EPA regulations in this report. Dr. Matson wishes to testify as to the industry standard of care for buried metallic piping and aboveground storage tanks with metallic bottoms. He plans to opine that the Refinery Defendants did not meet the standard of care because they did not prevent systematic corrosion of the underground piping and aboveground storage tanks and failed to expeditiously repair leaks when discovered, thus allowing continuing releases of hydrocarbons and other substances to the subsurface.

The Refinery Defendants contend that Dr. Matson is unqualified because he lacks relevant experience with respect to the issues in his report concerning the appropriate standards of care for cathodic protection of oily water sewers, fire suppression lines, and the implementation of an effective prevention program. They argue that his opinions are based solely on his review of secondary sources and limited work in the 1960s as a summer intern and for six months after graduation from college.

Dr. Matson is qualified to make the opinions in his report. Although he does not have significant practical experience working at refineries, he has been a professor of environmental engineering for over thirty years. Further, he has based his opinions on an extensive review of literature and research on this topic, not based on his limited experience at Sun Oil. As noted above, the qualification standard is liberal, and an expert may be sufficiently qualified even if "the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." Holbrook, 80 F.3d at 782.

The Refinery Defendants also contend that Dr. Matson's testimony is "unreliable because he (a) misstates, misinterprets or ignores the factual record; (b) makes generalizations based on isolated incidents; (c) has no basis to identify industry practice... and (d) focuses on certain American Petroleum

Institute and NACE standards, while ignoring the qualifying language in such standards and the fact that site specific conditions must determine what course of action should be undertaken."  Any possible errors made in Dr. Matson's report do not make his testimony unreliable and can instead be addressed on cross-examination.  Dr. Matson's methodology was sound and reliable under <u>Daubert</u> and based upon sufficient facts and data. <u>See</u> Fed. R. Civ. P. 702.